[L. A. No. 7240. In Bank.—November 1, 1924.]

WILLIAM D. SHREEVES et al., Appellants, v. NETTIE R. PEARSON, Respondent.

NETTIE R. PEARSON, Respondent, v. WILLIAM D. SHREEVES et al., Appellants.

[1] AGENCY—ESCROW—CAPACITIES OF ESCROW HOLDER.—When papers, moneys, or other articles are by the agreement of parties to a transaction delivered to an escrow holder to be held by him in that capacity and to be distributed by him to the respective parties or to other persons upon the performance of the terms of the escrow he is, prior to the performance of the conditions of the escrow, the agent of both parties thereto, and whenever the conditions attending the escrow have been so far performed that the transaction which has called the escrow into being becomes complete the nature of this dual agency changes to an agency not for both but for each of the parties to said transaction in respect to those things placed in escrow to which each has thus become completely entitled.

[2] ID.—ESCROW—DEPOSIT OF DEED—DELIVERY OF MONEY UPON PRODUCTION OF SATISFACTORY CERTIFICATE OF TITLE — WHEN AGENCY OF ESCROW HOLDER CHANGES.—Whenever a deed is deposited in escrow by the grantor to be delivered to the grantee upon payment by him to the escrow holder of a sum of money to be by the latter delivered to the grantor upon the production by the latter of a satisfactory certificate of title, the escrow holder is as to such deed and money the agent of both parties until such time as the

1.   See 10 Cal. Jur. 587; 10 R. C. L. 633.

said satisfactory certificate of title is produced, but he thereupon becomes the agent of the purchaser as to such deed and of the seller as to such money.

[3] ID.—CONTRACT OF PURCHASE—SPECIFIC PERFORMANCE—EJECTMENT —AGENCY OF ESCROW HOLDER — FINDINGS — EVIDENCE. — In these actions for specific performance of an agreement for the purchase and sale of certain premises, and for the ejectment of the buyers from said premises, the evidence was sufficient to sustain the finding of the trial court that the conditions of the escrow between the parties had not been so far performed as to render the escrow holder, at the time of his defalcation of moneys placed in his hands by the buyers on account of the purchase price, the agent of the seller and not of the buyers of said premises.

[4] ID.—ESCROW—PERFORMANCE.—It is one of the cardinal principles of law applicable to escrows that the terms and conditions of their fulfillment must be strictly performed.

---

(1) 21 C. J., p. 878, sec. 24.    (2) 21 C. J., p. 878, sec. 24.    (3) 21 C. J., p. 996, sec. 45 (1926 Anno.).    (4) 21 C. J., p. 880, sec. 25.

APPEALS from judgments of the Superior Court of Los Angeles County. Russ Avery, Judge. Affirmed.

The facts are stated in the opinion of the court.

Kennicott & Williams for Appellants.

Henry M. Lee and Walter L. Mann for Respondent.

RICHARDS, J.—These two cases were consolidated for the purposes of trial and have been presented together in the transcript and briefs upon appeal. In the first of these cases William D. Shreeves and Grace Shreeves, his wife, brought suit against Nettie R. Pearson for the specific performance of an agreement for the purchase and sale of certain premises, which resulted in a judgment in favor of the defendant. In the second of these cases said Nettie R. Pearson sued William D. Shreeves and wife in ejectment from the same premises and recovered judgment in her favor ousting said defendants from said premises. The same questions are involved in both appeals. The facts are

---

4. Necessity of strict compliance with conditions of escrow agreement, note, L. R. A. 1916A, 502. See, also, 10 Cal. Jur. 589; 10 R. C. L. 635.

practically undisputed and are briefly these: In the early part of the year 1921 Nettie R. Pearson listed with one H. B. Eshleman, a real estate broker doing business under the name of H. B. Eshleman Realty Company, certain real property constituting her home for sale. Thereafter said Eshleman, through one of his salesmen, showed the property to the Shreeves, who, on January 17, 1921, signed a so-called "sales deposit receipt," which purported to be in duplicate and one of which Nettie Pearson also signed. These duplicates, however, did not agree in their wording, certain erasures and interlineations appearing in one copy which did not appear in the other. Two days later the Shreeves signed another "sales deposit receipt" which recites the receipt by H. B. Eshleman Realty Company of $100 from W. D. Shreeves as deposit and part payment on account of the purchase of the property which said purchaser agreed to buy for the sum of $5,800, payable as follows: $2,400 cash upon the execution and delivery of a good and sufficient deed conveying the property to W. D. Shreeves, together with a guarantee certificate of title of an acceptable title company showing an unencumbered title, subject to a mortgage for $1,600 then being placed on said property, and a trust deed for $1,800 securing the balance of the purchase price. Time was made the essence of the agreement. If the price and terms were accepted within five days from date by the owner, the owner should have a reasonable time to bring down the certificate of title, any defect of the title to be removed by the owner within thirty days after the discovery of the same; and in the event said defect could not be removed within said time then the money should be returned to the purchaser upon demand. Nettie R. Pearson at the foot of said document accepted the above price and terms and agreed to deliver a good deed as above stated, and further agreed to pay the Realty Company $290 as their commission for negotiating the sale from the first money received on the purchase price. After the foregoing sales deposit receipt had been signed the parties thereto went, on the same day, though not together, to the escrow department of H. B. Eshleman Realty Company, where certain escrow instructions were executed. Nettie R. Pearson's seller's escrow instructions read as follows:

"Los Angeles, January 19th, 1921.
"H. B. Eshleman Realty Co.

"Escrow Dept.

"I will hand you a deed executed by myself, Nettie R. Pearson, a widow, to W. D. Shreeves, or parties to be named of the property and premises situate No. 2336 West 29th Place in the City of Los Angeles, according to the legal description thereof which you are authorized to the said buyers or their representatives upon payment to you within 30 days from date hereof for account of myself the sum of Twenty-four Hundred dollars (payable by check of the H. B. Eshleman Realty Co.), from which you may deduct your Escrow Charges $7.50 and for Title Guarantee and other costs below $—— and from which you may also pay all encumbrances on said property, except as specifically mentioned below, and from which you may deduct the sales commission of the H. B. Eshleman Realty Co., amounting to $290.00.

"As a part of the consideration for said deed, you will also procure Note executed by the buyers in favor of myself for $1800.00, payable in monthly installments of $50.00 from date of February 4th, 1921, including interest from said date at 7 per cent per annum. Secured by a Trust Deed usual form on said premises which by Guarantee shall show subject only to second installment of Taxes for the fiscal year 1920 1921 and to Mortgage of $1600 now of record to which said deed is made subject. I pay for recording said Trust Deed.

"Hold check, will call. Possession to be given at close of escrow. Existing insurance of $2500.00 to be pro-rated to date of recording deed. New insurance to be issued in an amount sufficient to protect me on the $1800 Trust Deed. Interest on existing $1600 mortgage to be pro-rated to close of escrow. Interest on $1800 Trust Deed to be adjusted at close of escrow. $——. For escrow $7.50. For internal revenue stamps on deed $4.50. Time is declared to be of the essence of these instructions. If you are unable to comply with these instructions within the time specified, said instruments shall be returned to me on my written demand; but in the absence of such demand you will proceed to comply with these instructions as soon as possible thereafter. Begin search of title at once, charges for which I

will pay. For drawing grant deed 2.50. For notary fee .50.''

The buyer's escrow instructions, which were executed on the same day by Grace Shreeves, read as follows:

"Los Angeles, January 19th, 1921.

"H. B. Eshleman Realty Co.,

"Escrow Dept.

"I have handed the H. B. Eshleman Realty Co. $100.00 as evidenced by sales deposit receipt, and will hand you the further sum of $1400.00 within 3 days from date hereof—all of which you are authorized to use in connection with your escrow No. 4154 when you can secure from me a title guarantee on the property and premises situate No. 2336 West 29th Place in the city of Los Angeles according to the legal description thereof which will show that the record title to said property is vested in William D. Shreeves and Grace Shreeves, my wife, as joint tenants free from encumbrances except second half taxes for the fiscal year 1920–1921 and a mortgage to be executed in favor of the party to be named for $2500.00 to be placed—(full amount of which is to go to seller) with interest at 7 per cent per annum, from said date, payable quarterly at Los Angeles and a trust deed in the usual form to be executed in favor of Nettie R. Pearson for $1800.00 securing a promissory note in like amount payable in monthly installments for $50.00 or more including interest at 7 per cent per annum from date of February 4, 1921.

"Secure such fire insurance policies as may be handed you for at least $—— insurance on $2500 now existing to be pro-rated to date of recording deed. Additional insurance as necessary to be issued to protect $1800 trust deed. Possession to be delivered at close of escrow. Interest upon $1600 mortgage to be pro-rated to close of escrow. Interest on $1800 trust deed to be adjusted to close of escrow.

"Obtain the note in my favor secured by said mortgage)

                                             trust deed)

"Instruct the recorder to mail: Deed to      mortgage to      The guarantee when completed to be delivered to      If you are unable to comply with the instructions within 30 days from this date said money and instruments shall thereafter be returned to me on my written demand, and in the absence of such demand you will proceed to

comply with these instructions as soon as possible thereafter. And time is declared to be of the essence of these instructions. All disbursements may be made by check of H. B. Eshleman Realty Co. I agree to pay the following charges before the close of this escrow: For guarantee vesting title in me on property I acquire $5.00. For transfer fire insurance policy or mortgage clause $——. Amt' required. For recorder's fees as follows (estimated) deed $1.00. For drawing trust deed 2.50. Notary fee 1.00. Revenue stamps on trust deed .36. Showing trust deed in certificate of title 2.50. Escrow 7.50.''

A reading of these respective escrow instructions discloses that they vary in their terms in this important respect, that while the seller's instructions call for a payment of $2,400 cash and a mortgage of $1,600 conformably with the sales deposit receipt, the buyer's escrow instructions state that the Shreeves are to pay $1,400 cash and that the property shall be subject to a mortgage for $2,500, which is a material variation from the sales deposit receipt, and which variation was explained by the manager of the Eshleman escrow department in his testimony before the trial court, which was uncontradicted and was as follows:

''I was informed that Mrs. Pearson, before she had made a sale of this property, had negotiated a loan of $1600, which was then in escrow with the Title Insurance Company; and that the loan was to remain on the property; that the Shreeves were to pay $2400 in cash—I mean a total of $4000—they were to pay us $2500 in cash, and I drew the instruction accordingly, and Mrs. Pearson signed the instructions. From that instruction I dictated the instruction for the buyers to sign, but they weren't present at that time. They came in either later that day or the next day, and I learned for the first time that the Shreeves didn't have $2400 in cash; they only had $1500 in cash; and to close the deal it would be necessary for them to increase this $1600 loan to $2500, to get $900 additional. That is the reason there is a correction in ink made in the Shreeves' instructions that had already been typewritten before Mrs. Shreeves came up; but when I learned that, I corrected it in ink; but it appears I didn't correct it in Mrs. Pearson's instructions.''

The escrow manager finally made an arrangement with one Gyle (a friend of the Shreeves) for the increase of the $1,600 loan to $2,500, the additional $900 thus to be obtained to be paid to Mrs. Pearson. The arrangement with Gyle was not to be consummated through the Eshleman escrow department, but through the escrow department of the Continental National Bank to which Gyle's instructions stated that said bank should hand the $2,500 to the Eshleman Company upon the delivery to the bank for him of a continuation title guarantee to the property showing title vested in the Shreeves free of any encumbrance, excepting a mortgage to be executed by the Shreeves to said Gyle to secure the payment of a promissory note for $2,500, and a trust deed as a second lien for $1,800, together with an insurance policy covering the dwelling-house in an amount at least of $2,500. Mrs. Pearson seems to have acquiesced in these variations from the terms of the second sales deposit receipt and of her own escrow instructions. When the Gyle loan had thus been arranged for and the Shreeves had paid over to Eshleman the additional $1,400 required to make up the first payment upon the property according to their escrow instructions, they desired to get possession of the premises, giving as their reason that their rent was about to become due for the place where they were then living; and they accordingly had the manager of the Eshleman escrow department persuade Mrs. Pearson to deliver possession to the Shreeves on condition that she was paid the sum of $625 out of the money held in escrow by the Eshleman Company. This being agreed to, the said escrow manager drew up a memorandum stating that "In consideration of my being given possession of the property involved in escrow 4154 in advance of the close of said escrow we hereby direct and authorize the escrow department of the H. B. Eshleman Realty Company to pay to Nettie R. Pearson the sum of $625.00 at this time on account of the purchase price of said property." It was testified by both Mrs. Pearson and the escrow manager that they thought that Mr. and Mrs. Shreeves signed the carbon copy of this document and kept the one signed. Thereupon and on February 17, 1921, a check of the H. B. Eshleman Company was given to Mrs. Pearson by the manager of the H. B. Eshleman Company, who also delivered to her a letter to the Continental Na-

tional Bank directing it, upon the delivery of title certificate and the insurance policy called for in the escrow, to deliver to Mrs. Pearson the check for $2,500 to be received from Gyle pursuant to its escrow payable to her instead of to the H. B. Eshleman Company as provided therein. This was evidently for the purpose of enabling her to pay off the $1,600 mortgage upon which she was liable and to retain the additional $900 to be paid her pursuant to the arrangement made by the Shreeves with Gyle and acquiesced in by her. Mrs. Pearson deposited the check for $625 in the Continental Bank and left the aforesaid letter with it. She had already deposited with the Eshleman escrow department her deed to the premises pursuant to her escrow, and the manager of the Eshleman escrow department had, on February 16, 1921, transmitted said deed to the Title Insurance and Trust Company of Los Angeles, together with mortgage executed by the Shreeves to Gyle for the $2,500 to be borrowed from him, and also the trust deed executed by the Shreeves to the Title Guarantee and Trust Company as trustee to secure their note to Mrs. Pearson for the sum of $1,800, and requesting a continuation title guarantee showing title to the property to be thus vested in the Shreeves, subject to the said $2,500 mortgage to Gyle, the trust deed to secure the Pearson note for $1,800 and the lien of certain taxes due or to become due for the fiscal year 1920–21. The $625 check of the H. B. Eshleman Company, which had been handed to Mrs. Pearson on February 17, 1921, was returned to her by the bank unpaid. She made several ineffectual attempts to collect it from H. B. Eshleman, who disappeared a few days thereafter leaving a large shortage in his accounts. Mrs. Pearson thereupon notified the Title Insurance and Trust Company not to record her deed and was advised by it that "the papers will not be recorded; everything is at a standstill in the Eshleman papers and will be until there is some adjustment made." It was stipulated at the trial that the Title Insurance and Trust Company had not furnished and had in fact refused to furnish its certificate of title to the property. In the meantime the Shreeves had been let into possession of the property under the special agreement above referred to and continued in such possession up to and after the trial of these cases. On March 4, 1921, Mrs.

Pearson served a demand in writing upon the Shreeves for the delivery to her of the possession of the premises in question, with which they refused to comply, but, on the contrary, on March 17, 1921, commenced their action for specific performance. On March 26, 1921, Mrs. Pearson commenced her action against them for possession of the premises. She was successful in both actions. The trial court made elaborate findings covering in much detail every phase of this rather complex situation, but in the main finding the facts to be as above more briefly stated. The main attack which the appellants in each of their appeals make upon these findings is upon that portion thereof wherein the trial court finds that at and prior to the date of the issuance by Eshleman of his worthless check and of his disappearance and defalcation in respect to the remainder of the sum of $1,500 constituting the first payment made by the Shreeves upon the purchase price of the property the escrow had not been so far closed as to render said Eshleman the agent of the seller in respect to these portions of the purchase price of said property. It is the contention of the appellants that the said findings of the trial court to this effect are not supported by the evidence in the case.

[1] It is conceded to be the correct rule of law that when papers, moneys, or other articles are by the agreement of parties to a transaction delivered to an escrow holder to be held by him in that capacity and to be distributed by him to the respective parties or to other persons upon the performance of the terms of the escrow he is, prior to the performance of the conditions of the escrow, the agent of both parties thereto (*Cannon* v. *Handley,* 72 Cal. 133 [13 Pac. 315]; *McDonald* v. *Huff,* 77 Cal. 279 [19 Pac. 499]), and that it is equally sound law that whenever the conditions attending the escrow have been so far performed that the transaction which has called the escrow into being becomes complete the nature of this dual agency changes to an agency not for both, but for each of the parties to said transaction in respect to those things placed in escrow to which each has thus become completely entitled. [2] To apply a simple illustration, whenever a deed is deposited in escrow by the grantor to be delivered to the grantee upon payment by him to the escrow holder

of a sum of money to be by the latter delivered to the grantor upon the production by the latter of a satisfactory certificate of title, the escrow holder is as to such deed and money the agent of both parties until such time as the said satisfactory certificate of title is produced, but he thereupon becomes the agent of the purchaser as to such deed and of the seller as to such money. The cases above cited sustain this view, as do also the cases of *Bradbury* v. *Davenport,* 120 Cal. 152 [52 Pac. 301]; *Marr* v. *Rhodes,* 131 Cal. 267 [63 Pac. 364]; *Whitney* v. *Sherman,* 178 Cal. 435 [173 Pac. 931]. **[3]** The question thus presented for our decision is as to whether the evidence in these instant cases was sufficient to sustain the finding of the trial court that the conditions of the escrow in question had not been so far performed as to render Eshleman at the time of his defalcation the agent of the seller and not of the buyers of these premises. If so these judgments are correct. If not they must be disapproved. An examination of the documents creating this escrow, assuming it to be such, would seem to clearly show that it was the intention of the parties thereto that it was not to be closed and the relation of the escrow holder to the respective parties thereby changed until every condition expressed in the terms of the instrument creating such escrow had been fully performed. The phrase "close of the escrow" is expressly and repeatedly used in relation to the performance of these conditions to be by each of said parties respectively performed. In the escrow document signed by Mrs. Pearson it is provided, "Possession to be given *at close of escrow.* Existing insurance of $2500.00 to be prorated to date of recording deed. New insurance to be issued in an amount sufficient to protect me on the $1800.00 trust deed. Interest on existing $1600.00 mortgage to be prorated *to close of escrow.* Interest on $1800.00 trust deed to be adjusted *at close of escrow.* Time is declared to be of the essence of these instructions. If you are unable to comply with these instructions within the time specified said instruments shall be returned to me upon my written demand." The same language with reference to the same conditions is repeated in the escrow instructions signed by Grace Shreeves, and it is further stated therein as follows: "I agree to pay the following charges *before the close of this escrow,"* enumerating a series of

items aggregating $19.85, and also certain undetermined charges which could only be ascertainable when the transaction was otherwise completed. It is thus made clear that the parties to these several documents did not contemplate that the escrow should be closed or the relation of the escrow holder to the respective parties thereto be changed until each and all of these conditions had been fully performed. It further appears from the document executed and delivered to the escrow holder by Grace Shreeves (and wherein it is apparent that she acted for both her husband and herself) that in delivering to the former the $1,500, which was to constitute their first payment on account of the purchase price of the property, she did so with the express instruction, "which you are authorized to use in connection with your escrow No. 4154 *when you can secure for me a title guarantee on the property and premises* (description) *which will show that the record title to said property is vested in Wm. D. Shreeves and Grace Shreeves,"* etc. When we look at the secondary escrow created in the Continental National Bank in relation to the $2,500 mortgage to be given by the Shreeves to Gyle we find the check for said sum delivered by said Gyle to the bank was only to be used by it "upon delivery to you for me by the H. B. Eshleman Realty Co. of your continuation title guarantee covering that certain real property (describing) showing title to said property to be vested in Wm. D. Shreeves and Grace Shreeves," together with the Shreeves mortgage for said sum and an insurance policy covering the dwelling-house upon said property in an amount not less than $2,500. This escrow closes with the statement, "You will thereupon hand to the said H. B. Eshleman Realty Co. your check payable to their order for the said sum of $2500.00." As to the requirement in the escrow documents signed respectively by Mrs. Pearson and the Shreeves relative to possession of the property being given to the latter at the close of the escrow, Mrs. Pearson was, as we have seen, prevailed upon to consent to deliver the possession of said property to them prior to the close of the escrow, but in the written memorandum signed by the Shreeves and relating to such possession it is stated, "In consideration of my being given possession of the property involved in escrow No. 4154 *in advance of the close of said escrow* we hereby direct and

authorize the escrow department of the H. B. Eshleman Realty Company to pay to Nettie R. Pearson the sum of $625.00 at this time on account of the purchase price of said property.'' The evidence in the case abundantly shows that it was this check which, several days later, was returned to Mrs. Pearson unpaid on account of the default and present disappearance of said Eshleman who, as we have seen, was during all of the times covered by the transaction merely masquerading under the name of H. B. Eshleman Realty Company operating in both its real estate and escrow departments. The undisputed evidence further shows that no such certificate of title as these several escrow documents require as a condition precedent to the completion of this escrow was ever made or issued by the Title Insurance and Trust Company of Los Angeles, the concern charged with this duty by the terms of these documents. It is contended by the appellants, however, that the performance of this duty was prevented by the act of Mrs. Pearson herself when the said check for $625 came back to her unpaid, but it significantly appears in the findings of the trial court herein ''that the said Title Insurance and Trust Company for certain reasons other than the request from said Pearson not to record said deed from her to the said Shreeves, upon the receipt of said above mentioned instruments and instructions from the escrow department of said Eshleman Realty Company, rejected and refused to complete the search in and to said title and refused to take any steps toward bringing down the said guarantee of title, and continues to refuse to complete the search to said title or to bring down said guarantee of title.'' This finding is supported by the statement of the manager of said Title Insurance and Trust Company going to show that on account of Eshleman's defalcation and disappearance all matters in which Eshleman was involved were at a standstill ''until there is some adjustment made.''

From the foregoing state of the record it would seem too clear for discussion that much remained to be done under the terms of these several escrow documents before this escrow could be deemed to be ''closed.'' The transaction of the Shreeves with Gyle upon which the payment to Mrs. Pearson of the sum of $2,500 depended was not and could

not be completed until the escrow holder in that transaction had received the required certificate of title showing the title to the property to be in the Shreeves. The title to the property could not be vested in the Shreeves until the delivery and recordation of the Pearson deed, and this by the express terms of the escrow depended not only upon the issuance of the certificate of title, which was never issued, but it also depended upon the doing of several other things referred to in said escrow as prerequisites to its close, such as the prorating of the insurance and the issuance of new policies which were to follow the recordation of the deed; and also the prorating of certain interest and the payment of certain incidental charges which were expressly required to be adjusted at the time of, and hence not after, the closing of the escrow, and which were all admittedly never done. And more important than these, it depended upon the completion of the other escrow which was to result in the delivery of a large part of the purchase price, and which transaction was never completed. [4] It is one of the cardinal principles of law applicable to escrows that the terms and conditions of their fulfillment must be strictly performed. (*Beem* v. *McCusick*, 10 Cal. 538; *Dyson* v. *Bradshaw*, 23 Cal. 528; *Bartley* v. *Fraser*, 16 Cal. App. 560 [117 Pac. 683].) We are compelled to the conclusion that there still remained unperformed a number of substantial requirements of this escrow at the time of Eshleman's defalcation, and hence that up to and at and after said time he still occupied his original position as the agent of the purchasers in respect to whatever portions of the purchase price of said property either were or were to come into his hands before the completion of said escrow. This being so it would inevitably follow both that the appellants in both cases did not become entitled to demand a specific performance of the agreement for the sale to them of said property and also that the respondent in both cases did become entitled to be repossessed of her said property upon the failure of the appellants to comply with their agreement for the purchase thereof.

The appellants urge a number of other grounds for a reversal of the cases based upon alleged erroneous findings of the trial court. These are in the main argumentative

and are predicated upon contentions which are disposed of in the treatment of the main issue in each case. We do not consider that these require separate consideration or that they possess sufficient merit to deserve it.

The judgment in each case is affirmed.

Lawlor, J., Waste, J., Lennon, J., Shenk, J., Myers, C. J., and Seawell, J., concurred.