[No. H001142. Sixth Dist. Oct. 14, 1986.]

JUDITH C. CLAUSSEN, Individually, as Trustee, etc., and as Executrix, etc., Plaintiff and Respondent, v. FIRST AMERICAN TITLE GUARANTY COMPANY, Defendant and Appellant.

## COUNSEL

Scott L. Thomas and Schneider & Wallerstein for Defendant and Appellant.

Bernard J. Vogel, Jr., and Anastasi, Frasse, Vogel & Nielsen for Plaintiff and Respondent.

**OPINION**

**AGLIANO, P. J.—**

I

Plaintiff recovered judgment for $64,978.95 against defendant/appellant First American Title Guaranty Company for negligence and breach of contract in defendant's handling of the escrow among plaintiff lenders and the borrower-buyer and seller. We reverse, disagreeing with the trial court's conclusion that a telephone conversation between plaintiff's agent and defendant resulted in an escrow instruction to defendant.

II

*Facts*

We review the evidence on appeal in favor of the prevailing party, resolving conflicts and drawing reasonable inferences in support of the judgment. (*California Bank* v. *Sayre* (1890) 85 Cal. 102, 104 [24 P. 713]; *Dunphy* v. *Dunphy* (1911) 161 Cal. 380, 384 [119 P. 512]; *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].)

In August 1982, Bonnie Beddingfield sold her property at 6400 Camden Avenue in San Jose for $127,000 to Paul Colagiovanni. She believed Harold Smith, who held himself out as a real estate broker, also was acquiring the property. Colagiovanni took title to the subject property by assuming the first and second deeds of trust and making a $6,000 down payment to Beddingfield. She thought the property was worth $150,000 at the time but she had to sell for less because she could not afford to keep it.

Smith concurrently arranged for James Dixon to buy the property from Colagiovanni for $217,000. Dixon's loan application was referred by Sentinel Mortgage Company to California Plan, a mortgage loan broker. Dino Bisordi of California Plan interviewed Dixon on August 13, 1982 at the latter's office, with Smith present. Bisordi was given a deposit receipt indicating the price of the property to be $217,000 and an appraisal of the property by Jeannete Reyla, valuing the property at $215,000. The deposit receipt also showed the buyer, Dixon, was making a deposit of $5,000 and a cash down payment of $57,750 and would assume the first deed of trust held by Glendale Federal in the amount of $72,650 and the second held by Old National in the amount of $49,000, contingent on the buyer obtaining a loan secured by a third deed of trust in the amount of $37,600. The receipt did not indicate whether the down payment was to pass through escrow.

Bisordi discussed the terms of the loan with Dixon and Smith and they seemed to agree the down payment would pass through escrow. Bisordi filled out a California Plan loan application which Dixon signed.

Bisordi brought the loan application to John Williamson, the president and majority shareholder of California Plan. Williamson questioned the appraisal, being generally familiar with the location of the property and unfamiliar with Reyla as an appraiser. He requested another appraisal, by Elmer Vincent, Jr., one of several independent appraisers with whom California Plan customarily dealt. On the back of the borrower's loan application was a form for the appraiser to complete, which identified the amounts of outstanding loans, the physical condition, size, and layout of the structure, and four comparable sales. Vincent appraised the property at $220,000, based in part on the proposed purchase price.

California Plan also obtained a credit check and an employment verification of Dixon, who had been employed by an insurance company for eight years and was receiving an annual salary of almost $74,000. When Vincent's appraisal confirmed the sale price, Williamson finally decided to approve the loan. It was important to him the buyer was going to pay almost $60,000 of his own money, indicating he was not likely to abandon the transaction. He assumed from the deposit receipt the down payment would pass through escrow. California Plan then prepared a lender's bulletin.

Williamson and James Lux, another California Plan employee, presented the prospect of making this loan to George Claussen. Claussen had been involved with California Plan for about six years, and was a knowledgeable investor who had made about twenty investments with them. Lux, Williamson and Claussen were friends. Williamson and Lux showed him the lender's bulletin, which described the buyer's employment and income, California Plan's appraisal of the property, and other information, such as existing deeds of trust. Claussen was shown the deposit receipt and it was also his feeling that a buyer who was making a $60,000 down payment was serious. He was aware it was a third deed of trust, but decided to make the loan. The following day, Lux had Mr. Claussen sign the necessary loan documents. George made the loan from the George E. Claussen, D.M.D., Inc. Money Purchase Pension Plan (Pension Plan), of which he and plaintiff Judith Claussen were trustees.

Smith and Colagiovanni opened escrow for the purchase of the property by Dixon with Stella Hagdohl at defendant First American Title. She never saw Dixon, but it was not unusual for the buyer not to appear before the escrow holder unless the seller requested it. Smith advised Hagdohl that Dixon would be assuming the first and second deeds of trust, and he requested

Hagdohl not to notify those lenders. Near the close of escrow, Hagdohl had the buyer and seller sign releases of liability by which they acknowledged the lenders had not been notified and they should contact an attorney to discuss possible legal consequences. Sometime near the close of escrow, Hagdohl learned that California Plan would be handling the funding of a third deed of trust.

At California Plan, Williamson asked Bisordi and Joy Neesmith, the manager of California Plan's escrow department, to call the title company and make sure escrow would not close until the down payment was made in escrow. On August 25, 1982, Neesmith called Hagdohl in order to determine whether First American had all the necessary documentation to close escrow, to determine when escrow would be closing, and in what capacity Dixon would be taking title. Hagdohl made a note of the conversation showing they discussed the loan amount would be $37,600 and the down payment would be $60,000. Hagdohl recalled not being specifically asked if the $60,000 was in escrow at that time. Neesmith, however, was sure she asked whether the amount was deposited in escrow and that Hagdohl answered either it was or it was expected before escrow closed. California Plan would not have released the funds to the borrower if the $60,000 had not been paid.

California Plan then prepared the final documents, including lender's escrow instructions to First American Title dated August 25, and a check. The written instructions described when the escrow holder was authorized to record the third deed of trust and disburse the loan. They did not mention a down payment of any amount in escrow, nor did they request a copy of the buyer's and seller's instructions. They did condition the close of escrow on fire insurance protecting the lender and did ask First American to forward copies of beneficiary statements of the first and second mortgage holders at the close of escrow. The beneficiary statement indicates whether the lender consents to an assumption as well as describing the amount due monthly and other information about the terms of the security. California Plan did not specifically require receipt of beneficiary statements prior to the close of escrow, relying on a business custom that a title company would advise a lender if a prior lender would not consent to an assumption. California Plan also prepared a deed of trust and a promissory note for $37,600, which Bisordi had Dixon sign on August 26.

Probably on August 30, and after the Neesmith phone call, Hagdohl was informed by Smith that the down payment was going to be made outside of escrow. First American Title drew up the buyer's and seller's escrow instructions to reflect a payment of $58,241.94 outside of escrow, which

were signed on August 31 by the buyer and seller. California Plan was not advised the payment was made outside of escrow.

The lender's escrow instructions were received by Hagdohl on August 31, the day before escrow closed on September 1. Hagdohl informed Smith he would have to provide the beneficiary statements and evidence of fire insurance to California Plan. She did not advise California Plan she could not honor their request. Hagdohl did send a letter to California Plan dated September 2, transmitting the beneficiary statements, which showed the first deed of trust holder, Glendale Federal, would not allow assumption without express consent. First American Title disbursed the $37,600 as follows: $14,379.92 to Paul and Deborah Colagiovanni; $5,891.03 to Harold Smith; $7,128.97 to California Plan; $35 to the City of San Jose; $8,179.43 to Transamerica Title (to close out a related transaction); and the rest to First American for escrow fees of $336, title transfer fees of $74, title insurance fee of $742.50, Santa Clara County recording and transfer tax of $833.15.

Upon the borrower's default in repayment, the Claussens advanced money from their Pension Plan and personal accounts to bring the prior loans current. Ultimately, on June 10, 1985, California Plan foreclosed on the property on behalf of the Claussens with the Claussens acquiring the property for $43,487.51.

### III

*Findings of Trial Court*

The trial court determined in written findings that California Plan was an agent of plaintiff Claussen and was not negligent in relying on the appraisal by Vincent or in any other respect in its conduct as a mortgage loan broker in this transaction. Dixon and Smith actively misrepresented Dixon's intent to purchase the property and repay the loan and were liable for fraud to plaintiff in the amount of $64,978.95. Plaintiff recovered judgment in her individual capacity, as trustee of the Pension Plan, and as executrix of her husband's estate, since he died after this action was filed. Defendant First American Title Guaranty Company did not participate in any conspiracy to defraud plaintiff or any misrepresentation to plaintiff.

The predicate for First American's liability was: "8. The Court finds that Joy Neesmith informed First American Title Guaranty Company's Escrow Officer, Stella Hagdahl [*sic*], that California Plan expected the $60,000.00 down payment to pass through escrow. [¶] 9. The Court finds that, during the telephone conversation between Joy Neesmith and Stella Hagdahl, about which Joy Neesmith testified, California Plan, as agent of Plaintiff, inquired

of First American Title Guaranty Company whether the $60,000.00 down payment had been received by escrow. [¶] 10. This inquiry put First American Title Guaranty Company on notice that California Plan required the $60,000.00 down payment to be deposited in escrow. [¶] 11. In light of this notice, the Court finds that the facts set forth in 8 and 9 above constituted an oral instruction to First American Title Company not to close escrow without the $60,000.00 being deposited in escrow." First American was liable for breach of this oral instruction.

The court further found: "15. With respect to the fourth cause of action, the Court finds that, by reason of the inquiry of California Plan, as agent for Plaintiff, concerning the $60,000.00, Defendant First American Title Guaranty Company was aware that the Plaintiff would require that the $60,000.00 payment be made through escrow. [¶] 16. The Court finds that such knowledge imposed a duty upon First American Title Guaranty Company to Plaintiff through its agent, California Plan, not to close escrow unless the $60,000.00 was deposited in escrow. [¶] 17. The failure of First American Title Guaranty Company to verify that said down payment was on deposit in escrow constituted a breach of its duty to Plaintiff and was negligence which directly and proximately caused damage to Plaintiff in the amount of $64,978.95." First American was entitled to be fully equitably indemnified by Dixon on its cross-complaint.

## IV

### Discussion

■ The parties are on common ground in recognizing an escrow holder is an agent for all parties who are exchanging instruments and payments through an escrow (*McDonald* v. *Huff* (1888) 77 Cal. 279, 282 [19 P. 499]) until the agency is ended by performance of the required acts. (*Shreeves* v. *Pearson* (1924) 194 Cal. 699, 707 [230 P. 448].) ■ "An escrow holder must comply strictly with the instructions of the parties. (*Rianda* v. *San Benito Title Guar. Co.* [1950] 35 Cal.2d 170, 173 [217 P.2d 25] . . .; *Shreeves* v. *Pearson*, [*supra*], 194 Cal. 699, 711 . . . .) Upon the escrow holder's breach of an instruction that it has contracted to perform or of an implied promise arising out of the agreement with the buyer or seller, the injured party acquires a cause of action for breach of contract. [Citations.] Similarly, if the escrow holder acts negligently, 'it would ordinarily be liable for any loss occasioned by its breach of duty.' (*Rianda* v. *San Benito Title Guar. Co., supra*, . . .)" (*Amen* v. *Merced County Title Co.* (1962) 58 Cal.2d 528, 531-532 [25 Cal.Rptr. 65, 375 P.2d 33].) ■ The escrow holder is a fiduciary of the parties to the escrow. (*Id.*, at p. 534.) An escrow holder has no general duty to police the affairs of its depositors, however.

An escrow holder's agency is limited to faithful compliance with instructions. (*Schaefer* v. *Manufacturers Bank* (1980) 104 Cal.App.3d 70, 77-78 [163 Cal.Rptr. 402], and cases there cited.)

We assume arguendo, as plaintiff asserts, that plaintiff lender was an equal party to this escrow along with the buyer and seller, since the escrow holder does not contend otherwise. (Compare *Moss* v. *Minor Properties, Inc.* (1968) 262 Cal.App.2d 847, 855 [69 Cal.Rptr. 341]—existing trust deed holder cannot issue a binding order to the escrow agent.) We also recognize that escrow instructions may be oral, even when some are in writing (*Kelly* v. *Steinberg* (1957) 148 Cal.App.2d 211, 217 [306 P.2d 955]; *Zang* v. *Northwestern Title Co.* (1982) 135 Cal.App.3d 159, 167-168 [185 Cal.Rptr. 176]; *Kern* v. *Henry* (1934) 138 Cal.App. 46, 52 [31 P.2d 454]) and that some escrow instructions may be implicit in the express instructions given. (*Gordon* v. *D & G Escrow Corp.* (1975) 48 Cal.App.3d 616, 621-623 [122 Cal.Rptr. 150]—escrow instructions implicitly required proceeds of sale to be paid to both sellers.) In the event of a conflict or apparent error in instructions, the escrow holder is obliged to take corrective steps before obeying questionable instructions. (*Diaz* v. *United California Bank* (1977) 71 Cal.App.3d 161, 167, 171 [139 Cal.Rptr. 314]; *Kirby* v. *Palos Verdes Escrow Co.* (1986) 183 Cal.App.3d 57, 65-66 [227 Cal.Rptr. 785].)

The finding underpinning the imposition of liability on defendant First American Title is that it was orally instructed or apprised of the lender's requirement that it not close escrow without receiving the down payment. Though the probative facts are undisputed, we cannot substitute our inferences for those of the trial court reasonably grounded on substantial evidence. (*Mah See* v. *North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426 [213 P.42, 26 A.L.R. 123] (disapproved on other grounds in *Zuckerman* v. *Underwriters at Lloyd's* (1954) 42 Cal.2d 460, 474 [267 P.2d 777]); *Primm* v. *Primm* (1956) 46 Cal.2d 690, 694 [299 P.2d 231]; *Hewitt* v. *Meaney* (1986) 181 Cal.App.3d 361, 368 [226 Cal.Rptr. 349].) "Substantial" means evidence "of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; cf. *Ofsevit* v. *Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9 [148 Cal.Rptr. 1, 582 P.2d 88].) It only takes one credible witness to prove a fact. (Evid. Code, § 411.)

When there is no conflict in the probative facts and only one inference can reasonably be drawn, then an appellate court is not bound by any contrary inferences by the trial court, because a question of law is presented. (*Gaston*

v. *Hisashi Tsuruda* (1935) 5 Cal.App.2d 639, 642 [43 P.2d 355]; *San Diego T. & S. Bank* v. *San Diego* (1940) 16 Cal.2d 142, 153 [105 P.2d 94, 133 A.L.R. 416]; *Fullerton Union High School Dist.* v. *Riles* (1983) 139 Cal.App.3d 369, 383 [188 Cal.Rptr. 897].) Reversal is proper when there is a complete lack of evidentiary support for a finding essential to the judgment. (*Lyle* v. *Rollins, et al.* (1864) 25 Cal. 437, 440; *Felton* v. *Le Breton* (1891) 92 Cal. 457, 464 [28 P. 490].)

We find insufficient support in the evidence for the crucial finding. At most, there was an inquiry by California Plan on behalf of plaintiff whether the down payment had been received in escrow. As defendant argued at trial and on appeal, this inquiry simply cannot be reasonably characterized as an instruction.

Escrow instructions are interpreted under the rules applicable to contracts. (Cf. *Francis* v. *Eisenmayer* (1959) 171 Cal.App.2d 221, 226-227 [340 P.2d 54].) "The duties of a depositee . . . are created and measured by the instructions of the depositor. By accepting the deposit and by acquiescence in the instructions the depositee undertakes to perform according to the terms thereof. There is a meeting of the minds and the birth of a contract." (*San Filippo* v. *Vita* (1947) 82 Cal.App.2d 290, 294 [186 P.2d 163].) An escrow is typically the mutual exchange of instruments through a third party and delivery to each party is conditioned on deposit by the other party. (Civ. Code, § 1057; e.g., *Hastings* v. *Bank of America* (1947) 79 Cal.App.2d 627, 629-630 [180 P.2d 358].) An escrow imposes concurrent conditions which are mutually dependent, requiring simultaneous performance. (Civ. Code, § 1437; *Hastings, supra.*) Any uncertainty in an escrow instruction should be interpreted against its maker. (Civ. Code, § 1654; *Francis* v. *Eisenmayer, supra,* 171 Cal.App.2d 221, 227.)

We find *Rianda* v. *San Benito Title Guar. Co., supra,* 35 Cal.2d 170, comparable. There when an escrow was opened, the escrow holder received a deposit receipt indicating the agreement for sale. The receipt acknowledged the seller had received a deposit of $5,000 which the seller could retain on default. The receipt also provided the deposit could be increased to $9,120 upon the purchaser's acceptance. Thereafter the escrow holder received a check from the buyer for $5,000, without any instructions. The escrow holder retained the check. The seller's oral and written instructions thereafter changed the terms of the payment of the purchase price, but did not mention a deposit or a $5,000 check. The buyer never gave the escrow holder any oral or written instructions. Apparently on the same day, the buyer informed the escrow holder he had stopped payment on the check, and the seller demanded by letter that the check be forwarded as the balance of the deposit. (*Id.,* at pp. 171-172.)

The seller claimed the escrow holder either breached its contract or acted negligently in retaining the check, specifically arguing that the deposit receipt "constituted instructions to cash the check or at least put defendant on notice of facts sufficient to place it under a duty to present the check promptly." (*Id.*, at p. 173.) The court stated: "We cannot agree, however, that mere knowledge of the terms of the unsigned copy of the agreement placed defendant under such a duty, and, moreover, it is difficult to see how the agreement can be construed as a direction to defendant to cash the check. It does not mention defendant or provide for an escrow, and it does not require anyone to cash checks received from the buyer. Nor is any reference made in the agreement to the check which was subsequently delivered to defendant without instructions. There is nothing in the agreement or elsewhere in the record to show that it was intended or understood as an instruction to defendant to do anything with the check." (*Ibid.*) The court noted that the check was not mentioned as a deposit or at all in the oral or written instructions. (*Id.*, at pp. 173-174.)

It is of similar significance in our case that the written lender's instructions, prepared the same day as the phone call from Neesmith to Hagdohl, do not mention as a condition of performance or at all a requirement that the down payment be received in escrow before disbursal of the loan. Neesmith did not testify her oral inquiry was intended to be an instruction, nor was there evidence it was customary in the business to phrase instructions as inquiries. Even if her question communicated her expectation the payment would pass through escrow, it did not amount to an escrow condition. Without an instruction to this effect, defendant was not under a duty to hold up the close of escrow pending receipt of the down payment in escrow or resolution of any doubts.

Anticipating this conclusion, plaintiff also argues there were other breaches of duty by defendant which caused the same damage.[1] Plaintiff asserts defendant failed to provide evidence of fire insurance prior to closing escrow and failed to provide beneficiary statements at the close of escrow. We are in accord with the trial court's oral analysis of plaintiff's contention regarding fire insurance. "Well, the place didn't burn down, so that didn't matter, did it?" Plaintiff also acknowledges in her brief there was no testimony establishing that she or her agent, California Plan, would have prevented close of escrow upon learning she was not named on any fire insurance. In fact, she made no claim against defendant for months after escrow closed without her being named.

---

[1]Neither at trial nor on appeal has plaintiff argued defendant's liability is based on negligent provision of misinformation in the course of its business to a party intended to rely on it. (E.g., *De Zemplen* v. *Home Federal S. & L. Assn.* (1963) 221 Cal.App.2d 197, 205-206 [34 Cal.Rptr. 334].)

We are also in accord with the trial court's oral analysis of plaintiff's contention regarding the beneficiary statements. "The court . . . cannot find that the failure to comply with the written instructions concerning the beneficiary statement, had any causal—even though there was such a failure—that there is no basis for damages in connection with that failure[,] [b]ecause the effect of the failure is speculative, in terms of what the first and second lender would have—would or would not have done, had they received the appropriate information."[2]

V

The judgment in favor of plaintiff against defendant First American Title Guaranty Company is reversed. Costs on appeal to defendant.

Brauer, J., and Simmons, J.,* concurred.

---

[2]Reaching these conclusions, we need not consider appellant's other arguments that California Plan as plaintiff's agent was comparatively negligent and that even if appellant breached a duty, the cause of plaintiff's damages was entirely the fraud of the other defendants.

*Assigned by the Chairperson of the Judicial Council.