[No. D056359. Fourth Dist., Div. One. Mar. 11, 2011.]

KELLY MINICH et al., Plaintiffs and Appellants, v.
ALLSTATE INSURANCE COMPANY, Defendant and Respondent.

COUNSEL

Winters & Associates, Jack B. Winters; Nicholas & Butler, Craig M. Nicholas and Matthew Bartley Butler for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps, R. Randal Crispen, Peter H. Klee and Marc J. Feldman for Defendant and Respondent.

OPINION

AARON, J.—

I.

INTRODUCTION

Allstate Insurance Company (Allstate) issued Kelly and Debbie Minich (the Minichs) a homeowners insurance policy (Policy) that provided that Allstate would pay the Minichs the "actual cash value" of their house, in an amount not to exceed the "limit of liability shown on the Policy Declarations," if the house were damaged or destroyed.[1] The "Building Structure Reimbursement" provision of the Policy provided that Allstate would pay the Minichs an amount in excess of the actual cash value if the Minichs were to "repair, rebuild or replace" their house. An endorsement to the Policy modified the "Building Structure Reimbursement" provision to state that this additional payment would not exceed "150% of the limit of liability."

---

[1] The Policy's limit of liability was $129,840, subject to a $250 deductible.

After the Minichs' house was destroyed by a fire, Allstate paid the Minichs $129,590—the limit of liability as shown on the Policy's declarations, minus a $250 deductible. However, Allstate refused to pay the additional $64,920 provided for in the endorsement until the Minichs furnished Allstate with evidence that they were, in fact, rebuilding their house. Allstate paid the Minichs the additional $64,920 approximately 15 months after the fire, once the Minichs demonstrated to Allstate that they were rebuilding their house.

The Minichs filed this action against Allstate, claiming that Allstate should have paid them the $64,920 immediately after the fire. The Minichs contend that Insurance Code sections 2051 and 2051.5[2] require that an insurer pay the "policy limit" (§ 2051, subd. (b)(1)) of a homeowners policy whenever the house is destroyed, irrespective of whether the insured rebuilds the house, and that the "policy limit" (*ibid.*) of their Policy includes the $64,920 provided for in the endorsement.

Allstate filed a motion for summary judgment in which it argued that it had timely paid the Minichs the full "policy limit" under section 2051, subdivision (b)(1), and that the additional $64,920 represented an amount *above* the policy limit. Allstate maintained that it was not required to pay the additional $64,920 until and unless the Minichs rebuilt their house. The trial court granted Allstate's motion, and entered judgment in its favor. The Minichs appeal. We affirm the judgment.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

A.  *Factual background*

On October 23, 2007, the Minichs' house was destroyed by a wildfire. At the time of the fire, the Minichs insured their house though the Policy. The Policy's declarations state that the "Limits of Liability" for "Dwelling Protection" coverage is $129,840, subject to a $250 deductible. The declarations also indicate that the Policy contains an endorsement entitled "Building Structure Reimbursement Extended Limits" (BSREL Endorsement). The BSREL Endorsement modifies a portion of the Policy that describes the manner by which Allstate would pay for a loss. As modified by the BSREL Endorsement (shown in italics below), the Policy states in relevant part:

"5. How We Pay for a Loss

---

[2] Unless otherwise specified, all subsequent statutory references are to the Insurance Code.

"Under Coverage A—Dwelling Protection . . . payment for covered loss will be by one or more of the following methods: [¶] . . . [¶]

"b) Actual Cash Value. If you do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis. This means there may be a deduction for depreciation. Payment will not exceed the limit of liability shown on the Policy Declarations for the coverage that applies to the damaged, destroyed or stolen property, regardless of the number of items involved in the loss.

"You may make claim for additional payment as described in paragraph 'c' . . . if you repair or replace the damaged, destroyed or stolen covered property within 180 days of the actual cash value payment.

"c) Building Structure Reimbursement. Under Coverage A—Dwelling Protection . . . we will make additional payment to reimburse you for cost in excess of actual cash value if you repair, rebuild or replace damaged, destroyed or stolen covered property within 180 days of the actual cash value payment. . . .

"Building Structure Reimbursement will not exceed the smallest of the following amounts:

"1) the replacement cost of the part(s) of the building structure(s) for equivalent construction for similar use on the same residence premises;

"2) the amount actually and necessarily spent to repair or replace the damaged building structure(s) with equivalent construction for similar use on the same residence premises; or

"3) *150% of the limit of liability applicable to the building structure(s) as shown on the Policy Declarations for Coverage A—Dwelling Protection . . . regardless of the number of building structures and structures other than building structures involved in the loss.*" (Italics added.)

On November 7, 2007, approximately two weeks after the fire, Allstate paid the Minichs $129,590. In December 2007, the Minichs' representative, Geoff Moyle, informed Allstate that the Minichs had received a bid in the amount of $373,884.38 to replace their house. Moyle requested that Allstate immediately pay the Minichs additional funds, pursuant to the BSREL

Endorsement.[3] In January 2008, Allstate offered to release an additional $64,920 upon the Minichs' submission of an acceptable rebuild estimate and a copy of a signed contract to rebuild the house.

In May 2008, after further negotiations between Moyle and Allstate concerning Allstate's release of the $64,920, Allstate offered to pay the Minichs the additional $64,920 if the Minichs provided a copy of approved building permits for their new house, a copy of the rebuild plans, and evidence that construction of the foundation on the new house was completed. On November 21, 2008, Moyle provided Allstate with approved building permits for the Minichs' new house; on January 7, 2009, Moyle informed Allstate that the foundation of the new house was ready for inspection. A few days later, Allstate inspected the property and confirmed that the foundation had been completed. On February 7, 2009, Allstate paid the Minichs the remaining $64,920, as provided for in the BSREL Endorsement. As of May 28, 2009, the Minichs' new house was approximately 50 percent complete.

B.  *Procedural history*

In October 2008, the Minichs filed a complaint against Allstate alleging numerous causes of action, including breach of contract and tortious breach of contract (bad faith). In their breach of contract claim, the Minichs alleged that Allstate was required to pay the entire $194,760 of benefits available under the Policy "prior to and regardless of whether any provision of the [P]olicy required payment to be made only upon repair, rebuilding, or replacement pursuant to the provisions of California Insurance Code [sections] 2051 and 2051.5." In their bad faith claim, the Minichs claimed that Allstate had violated the covenant of good faith by, among other actions, delaying payments that were due under the Policy. The Minichs also alleged that Allstate's tortious conduct entitled them to an award of punitive damages.

In July 2009, the Minichs dismissed all of their causes of action except the claims for breach of contract and bad faith. Allstate subsequently filed a motion for summary judgment or summary adjudication in which it claimed that the Minichs' breach of contract and bad faith claims failed as a matter of law. In its motion, Allstate maintained that the Minichs' breach of contract claim failed because Allstate had paid the Minichs all policy benefits that were due under the Policy. Allstate claimed that it had paid the Minichs the full $129,590 policy limit within two weeks of the fire, and that because the

---

[3] Moyle requested that Allstate pay the Minichs $194,760. However, it is undisputed that Allstate had previously paid the Minichs $129,590, and that the Policy had a $250 deductible. It is thus undisputed that only $64,920 remained at issue as of the time Moyle wrote to Allstate in December 2007.

Minichs "still have not rebuilt their house, Allstate's contractual obligation to pay the extended limit has not been triggered (even though Allstate paid it anyway)." Allstate noted that payments under the Building Structure Reimbursement portion of the Policy, as modified by the BSREL Endorsement, were payable only if the Minichs were to "repair, rebuild or replace damaged, destroyed or stolen covered property . . . ."

Allstate argued that the Policy was consistent with section 2051.5, subdivision (a), which provides in relevant part: "If the policy requires the insured to repair, rebuild, or replace the damaged property in order to collect the full replacement cost, the insurer shall pay the actual cash value of the damaged property, as defined in Section 2051, until the damaged property is repaired, rebuilt, or replaced. Once the property is repaired, rebuilt, or replaced, the insurer shall pay the difference between the actual cash value payment made and the full replacement cost reasonably paid to replace the damaged property, up to the limits stated in the policy."

The Minichs opposed Allstate's motion. In their opposition, the Minichs claimed that Allstate was required to pay them the full $194,760 in benefits available under the Policy without regard to whether they rebuilt their house. The Minichs reasoned that sections 2051 and 2051.5 require that an insurer pay the "policy limit or the fair market value of the structure, whichever is less" (§ 2051, subd. (b)(1)), without regard to whether the insured repairs the structure. The Minichs maintained that the "policy limit" (§ 2051, subd. (b)(1)) of their Policy included the $64,920 provided for in the BSREL Endorsement, and claimed that Allstate had breached the Policy and had acted in bad faith in delaying payment of the $64,920 provided for in the BSREL Endorsement.

After further briefing and a hearing, the trial court entered an order granting Allstate's motion for summary judgment. The trial court reasoned that Allstate had paid the Policy's limit of liability in the amount of $129,840, minus the $250 deductible, within two weeks of the fire, and that Allstate was not required to pay the additional funds provided for under the BSREL Endorsement until "there is a repair, rebuild, or replacement." The court determined that "there was no breach of contract by Allstate requiring proof of repair or replacement prior to payment of the extended coverage under the [BSREL Endorsement]." The court also found that the Policy was consistent with sections 2051 and 2051.5. Finally, the trial court concluded that there was no evidence to support the Minichs' bad faith claim because Allstate had timely paid all benefits that were due under the Policy.

The trial court entered a judgment in favor of Allstate. The Minichs timely appeal from the judgment.

III.

DISCUSSION

*The trial court properly granted Allstate's motion for summary judgment*

The Minichs claim that the trial court erred in granting Allstate's motion for summary judgment. Specifically, they maintain that "[s]ummary judgment against the Minichs must be overturned because as a matter of law Allstate was required to pay the sum of $194,760 without regard to repair or replacement."

A. *Governing law*

1. *The law governing summary judgment*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant may make this showing by establishing that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action. (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466 [54 Cal.Rptr.3d 568].)

In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]' [Citation.]" (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143 [29 Cal.Rptr.3d 144].)

2. *Relevant statutory law*

Section 2051 provides in relevant part:

"(a) Under an open policy, the measure of indemnity in fire insurance is the expense to the insured of replacing the thing lost or injured in its condition at the time of the injury, the expense being computed as of the time of the commencement of the fire.

"(b) Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, shall be determined as follows:

"(1) In case of total loss to the structure, the policy limit or the fair market value of the structure, whichever is less."

Section 2051.5 provides in relevant part:

"(a) Under an open policy that requires payment of the replacement cost for a loss, the measure of indemnity is the amount that it would cost the insured to repair, rebuild, or replace the thing lost or injured, without a deduction for physical depreciation, or the policy limit, whichever is less.

"If the policy requires the insured to repair, rebuild, or replace the damaged property in order to collect the full replacement cost, the insurer shall pay the actual cash value of the damaged property, as defined in Section 2051, until the damaged property is repaired, rebuilt, or replaced. Once the property is repaired, rebuilt, or replaced, the insurer shall pay the difference between the actual cash value payment made and the full replacement cost reasonably paid to replace the damaged property, up to the limits stated in the policy."

### 3. *Applicable principles of contract and statutory interpretation*

■ "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. [Citation.] 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" . . .' [Citation.]" (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647–648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].)

In *Doe v. Brown* (2009) 177 Cal.App.4th 408, 417–418 [99 Cal.Rptr.3d 209], this court outlined the following well-established principles of statutory interpretation:

■ " 'In construing any statute, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." [Citation.] "We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent.

[Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.] If the statutory language is unambiguous, "we presume the Legislature meant what it said, and the plain meaning of the statute governs." [Citation.]' [Citation.]

" 'If, however, the statutory language is ambiguous or reasonably susceptible to more than one interpretation, we will "examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes," and we can " ' "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " [Citation.]' [Citation.]

" ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.] Further, 'We presume that the Legislature, when enacting a statute, was aware of existing related laws and intended to maintain a consistent body of rules. [Citation.]' [Citation.]"

We apply the de novo standard of review in interpreting an insurance policy or statutory law. (*Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1377 [118 Cal.Rptr.3d 95, 242 P.3d 1020] [insurance policies]; *Doe v. Brown, supra,* 177 Cal.App.4th at p. 417 [statutes].)

B. *Application*

    1. *The Minichs' breach of contract claim fails as a matter of law because neither the Policy nor statutory law required Allstate to pay monies provided for in the BSREL Endorsement without regard to repair or replacement*

        a. *The Policy does not require that Allstate pay monies as provided for in the BSREL Endorsement without regard to repair or replacement*

The Minichs maintain that they reasonably understood the BSREL Endorsement to have extended their "policy limit" as that term is used in section 2051, subdivision (b)(1). In support of this argument, the Minichs note that

the endorsement is entitled "Building Structure Reimbursement *Extended Limits* Endorsements," and argue that a reasonable person would interpret the phrase "Extended Limits" as operating to increase the "Limits of Liability" referenced in the Policy's declarations. The Minichs contend that section 2051, subdivision (b)(1) and section 2051.5, subdivision (a) mandate that Allstate pay the "policy limit" (§ 2051, subd. (b)(1)) without regard to whether the Minichs rebuilt their house.

We disagree that the parties intended that the BSREL Endorsement would increase the "policy limit." (§ 2051, subd. (b).) Rather, the BSREL Endorsement modifies the manner by which Allstate will pay pursuant to the Building Structure Reimbursement provision of the Policy. The Policy originally provided that the "Building Structure Reimbursement will not exceed the smallest of the following amounts: [¶] . . . [¶] 3) the limit of liability . . . ." The BSREL Endorsement modifies item 3 of the Building Structure Reimbursement provision to state that, where applicable, Allstate will pay "150% of the limit of liability." The BSREL Endorsement thus makes it clear that any payment pursuant to that endorsement would be an amount *in excess of* the limit of liability or "policy limit." The BSREL Endorsement does not *increase* the Policy's limit of liability. (See *Caroselli v. Allstate Property and Casualty Ins. Co.* (E.D.Pa., Aug. 16, 2010, Civ. A. No. 10-1671) 2010 U.S.Dist. Lexis 83515 (*Caroselli*).)

In *Caroselli*, the court considered a plaintiff's argument that an endorsement that was identical in all material respects to the endorsement at issue in this case "increase[d] the . . . limit of liability" of a homeowners policy. (*Caroselli, supra*, 2010 U.S.Dist. Lexis 83515 at p. *12.) The *Caroselli* court squarely rejected this argument, holding, "nothing in the endorsement suggested that it altered the . . . liability limit . . . ." (*Id.* at p. *13; accord, *Bonito v. Cambridge Mutual Fire Ins. Co.* (2001) 64 Conn.App. 487, 493 [780 A.2d 984, 988] [replacement cost endorsement "provided additional coverage" but "did not reset or alter the policy limits"].)

The Minichs' interpretation is flawed for a second fundamental reason. The Policy contains a *single* limit of liability for Dwelling Protection coverage, which applies to payments made under both the Actual Cash Value and Building Structure Reimbursement provisions of the Policy. If, as the Minichs contend, the BSREL Endorsement "operated to extend the Minichs' limits of liability," the endorsement would necessarily extend the "limits of liability" as applied to the Actual Cash Value provision of the Policy, as well. If the Policy were interpreted in the manner that the Minichs suggest, an insured could collect the entire $194,760 pursuant to the Actual Cash Value provision of the Policy, regardless of whether the insured undertook to repair or replace the damaged property. This result would be inconsistent with the fact that the Policy unambiguously provides that an insured may only recover the entire

$194,760 pursuant to the Building Structure Reimbursement provision, which is contingent upon the insured "repair[ing], rebuild[ing] or replac[ing] [the] damaged, destroyed or stolen covered property . . . ." (See *Caroselli, supra*, 2010 U.S.Dist. Lexis 83515 at pp. *13–*14 [rejecting as contrary to "the clear language of the [p]olicy" plaintiff's theory that endorsement increased limit of liability because, if followed, such a theory "would always allow an insured to collect the building structure reimbursement, regardless of whether he undertook to repair or replace the damaged property"].) Accordingly, we conclude that the BSREL Endorsement unambiguously provides for a potential payment *in excess of* the Policy's limit of liability, and that it does not increase the limit of liability or "policy limit."[4]

> b. *Section 2051 and section 2051.5 do not require that Allstate pay monies as provided for in the BSREL Endorsement without regard to repair or replacement*

The Minichs contend that, even assuming that the BSREL Endorsement does not extend the "policy limit" (§ 2051, subd. (b)) as a matter of contractual law, the BSREL Endorsement extended the "policy limit" as a matter of California statutory law. The Minichs' argument in this regard is as follows. Section 2051.5 mandates that when an open fire insurance policy requires that the insurer pay replacement costs, the insurer must pay the insured the "actual cash value of the damaged property, as defined in Section 2051," without regard to whether the insured replaces the property.[5] Actual cash value is defined in section 2051, subdivision (b)(1) as "the policy limit or the fair market value of the structure, whichever is less." The Minichs argue that the term "policy limit" in section 2051, subdivision (b)(1) should be interpreted to mean "the maximum policy benefit potentially owed under the policy," and claim that the "policy limit" (§ 2051, subd. (b)(1)) under California law was thus $194,760—the $129,840 referenced as the "Limits of Liability" on the declarations page, *plus* the additional $64,920 provided for in the BSREL Endorsement. Based on this reasoning, the Minichs claim that Allstate was statutorily required to pay them monies provided for in the BSREL Endorsement irrespective of whether they rebuilt their house.

---

[4] The Minichs also argue that the terms of the BSREL Endorsement, as interpreted by Allstate, "conflict" with sections 2051 and 2051.5. The Minichs contend that the Policy states that it conforms to California law, and that sections 2051 and 2051.5 required that Allstate pay monies provided for in the BSREL Endorsement without regard to repair or replacement. This argument begs the question whether sections 2051 and 2051.5 require that Allstate pay monies provided for in the BSREL Endorsement, irrespective of whether the Minichs rebuilt their house. We consider that question in the following part.

[5] It is undisputed that the Policy is an "open" "fire insurance" policy as those terms are defined in the Insurance Code. (§§ 410, 102.)

Allstate counters that the Policy's "policy limit" (§ 2051, subd. (b)(1)) is the $129,840 referenced in the Policy's "Limits of Liability." Allstate contends that the monies payable pursuant to the BSREL Endorsement constitute an amount *above* the policy limit, and that section 2051 and section 2051.5 thus do not require that Allstate pay the Minichs the $64,920 provided for in the BSREL Endorsement without regard to whether the Minichs rebuilt their house. We agree with Allstate.

It is undisputed that the Insurance Code does not expressly define the term "policy limit" as used in section 2051, subdivision (b)(1). However, an examination of another provision of the Insurance Code makes the meaning of the term clear. Section 10101 requires an insurer who offers residential property insurance to provide its insureds with a disclosure statement as specified in section 10102.[6] The disclosure statement "describes the principal forms of insurance coverage in California for residential dwellings." (§ 10102.)

Section 10102 provides in relevant part:

"LIMITED REPLACEMENT COST COVERAGE WITH AN ADDITIONAL PERCENTAGE PAYS REPLACEMENT COSTS UP TO A SPECIFIED AMOUNT ABOVE THE POLICY LIMIT.

"In the event of any covered loss to your home, the insurance company will pay to repair or replace the damaged or destroyed dwelling with like or equivalent construction up to a specified percentage over the policy's limits. See the declarations page of your policy for the limit that applies to your dwelling. Your policy will specify whether you must actually repair or replace the damaged or destroyed dwelling in order to recover this benefit. The amount of recovery will be reduced by any deductible you have agreed to pay." (Original underscore.)

In referring to the payment of amounts "above the policy limit" or "over the policy's limits" (§ 10102, underscoring & capitalization omitted), section

---

[6] The Minichs argue that this court should not consider section 10102 in interpreting section 2051, subdivision (b)(1) because Allstate failed to cite this statute in the trial court. We reject the contention. The proper interpretation of section 2051, subdivision (b)(1) is a pure question of law, and does not depend on the parties' presentation of factual evidence. Under these circumstances, Allstate has not forfeited its argument regarding section 10102. (See *People v. Lexington National Ins. Corp.* (2010) 181 Cal.App.4th 1485, 1491–1492 [105 Cal.Rptr.3d 469].) In any event, assuming that Allstate has forfeited this argument, we may exercise our discretion to consider forfeited arguments (*In re Marriage of Fernandez-Abin & Sanchez* (2011) 191 Cal.App.4th 1015, 1036, fn. 17 [120 Cal.Rptr.3d 227]), and do so in this case so that we may properly interpret the term "policy limit" in section 2051, subdivision (b)(1).

10102 clearly uses the term "policy limit" to refer to a policy's limits of liability. This definition is consistent with the manner in which such insurance policies are ordinarily described. (See *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1204 [87 Cal.Rptr.3d 556] ["The declarations page specified that the extended replacement cost was 25 percent *over the policy limits . . . .*" (italics added)]; *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 653 [75 Cal.Rptr.3d 812] ["Extended replacement cost coverage was defined as the amount of replacement cost up to a specified amount *above the policy limit.*" (italics added)]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2010) ¶ 6:284.1, p. 6B-33 (rev. # 1, 2009) ["Replacement cost coverage may be extended to include a specified percentage (e.g., 10%) above *the policy limit.*" (italics added & omitted)].)[7]

It would not be reasonable to interpret the term "policy limit" in section 10102 to mean the "maximum policy benefit potentially owed under the policy," because such an interpretation would read the provision as describing an insurance policy that provides for the payment of an additional percentage, over *the maximum benefit* payable under the policy. By definition, it would not be possible to pay an amount that is *more than* the *greatest* amount payable. Further, since sections 10102 and 2051, subdivision (b) pertain to the same subject matter, it is clear that the Legislature intended that the term "policy limit" in both sections 10102 and 2051, subdivision (b) refer to a policy's limit of liability. (See, e.g., *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 945 [87 Cal.Rptr.3d 365] [" '[S]imilar words or phrases in statutes . . . dealing with the same subject matter . . . ordinarily will be given the same interpretation.' "].)

If accepted, the Minichs' contention that "policy limit" in section 2051, subdivision (b)(1) refers to the "maximum policy benefit potentially owed under the policy" would necessarily mean that the Policy does not pay any benefits *above* the policy limit. If this were so, it would make no sense for the Legislature to require that insurers disclose that such a policy provides for payment "above the policy limit." (§ 10102.) Our interpretation is preferable to the interpretation that the Minichs posit, since it "harmonizes" section 2051, subdivision (b)(1) and section 10102. (*Doe v. Brown, supra,* 177 Cal.App.4th at p. 417.)

---

[7] In 2004, the Legislature amended the disclosure statement provided in section 10102 to change the phrase "extended replacement cost coverage" to "limited replacement cost coverage with an additional percentage." (Stats. 2004, ch. 385, § 1, p. 3510.) In 2010, the Legislature changed the phrase "limited replacement cost coverage with an additional percentage" back to "extended replacement cost." (Stats. 2010, ch. 589, § 2, operative July 1, 2011.)

In another argument, the Minichs contend that the BSREL Endorsement changes "the amount of coverage," and thereby "extend[s] the amount of the 'policy limits.' " While the BSREL Endorsement clearly changes the amount of *coverage*, it does not change the policy *limit*. Rather, it provides for a payment "above the policy limit" (§ 10102). (See pt. III.B.1.a., *ante*.)

The Minichs also argue that section 10103.5 supports their interpretation of "policy limit" as used in section 2051, subdivision (b)(1). The Minichs note that section 10103.5 requires that insurers provide a "California Residential Property Insurance Bill of Rights," which states in relevant part, "An agent or insurance company may help you establish policy limits that are adequate to rebuild your home." The Minichs argue that this court should adopt their interpretation of "policy limit" in section 2051, subdivision (b)(1) because such an interpretation would further the public policy of ensuring that the policy limit is an amount sufficient to allow insureds to rebuild their houses. We find nothing in this portion of section 10103.5 that has any interpretative relevance to the issues in this case.

The Minichs further contend that it would be "inequitable" for the court to allow Allstate to rely on section 10102 because there is no evidence that Allstate provided the Minichs with the disclosure mandated by that section. Whether Allstate provided the Minichs with the mandated disclosure provided in section 10102 has no relevance in determining the issue of statutory interpretation that this appeal presents.

The Minichs maintain that section 10102 cannot be instructive in interpreting the meaning of the term "policy limit" in section 2051, subdivision (b)(1) because section 2051 was enacted long before section 10102. The Minichs assert that section 2051, subdivision (a), which was enacted in 1935 "contain[ed] the initial reference to 'policy limit,' " and that section 10102 was enacted "almost 60 years" later. The Minichs are factually wrong. The Legislature first used the term "policy limit" in section 2051 in 2004, when the Legislature enacted section 2051, subdivision (b)(1). (Stats. 2004, ch. 605, § 2, p. 4763.) Thus, at the time the Legislature first used the term "policy limit" in section 2051, subdivision (b)(1), it had already recognized, through its enactment in 1992 of section 10102, that an insurance policy may provide for payments "above the policy limit." (Stats. 1992, ch. 1089, § 1, p. 5031.)

Finally, the Minichs note that the Legislature has enacted a statute that repeals section 10102, effective July 1, 2011. (Stats. 2010, ch. 589, § 2, operative July 1, 2011.) The Minichs argue that section 10102 "should be

given minimal weight because by the amendment, the Legislature has determined to phase out section 10102." This argument is wholly unpersuasive, since Statutes 2010, chapter 589, section 2 mandates a new disclosure statement that makes it even clearer that the Legislature recognizes that an endorsement such as the one at issue in this case does not increase the policy limit. The new disclosure statement provides in relevant part:

"Extended Replacement Cost provides additional coverage *above the dwelling limits* up to a stated percentage or specific dollar amount." [¶] . . . [¶]

"Consider increasing your coverage limits *or* purchasing Extended Replacement Cost coverage to prepare for this possibility." (Stats. 2010, ch. 589, § 2, italics added.)[8]

We also reject the Minichs' argument that public policy considerations support interpreting the term "policy limit" (§ 2051, subd. (b)(1)) to mean the "maximum policy benefit." The Minichs contend that the "main purpose behind a replacement policy's requirement that a homeowner . . . rebuild prior to receiving benefits is to ensure that the homeowner will not be 'bettered' because of his or her loss." The Minichs maintain that this rationale does not apply in a case, such as this, in which the "policy limit" (§ 2051, subd. (b)(1)) is below the fair market value of the house, because the insured will not recover the full market value, even after the maximum policy benefit is paid. In such cases of underinsurance, the Minichs argue that the insurer should not be permitted to condition payment of *any* of the proceeds of the policy on replacement of the house.

The Legislature could have rationally rejected such an argument, on the basis that a statute that required an insurer to pay replacement cost value without regard to whether the insured actually replaces a property, whenever the insured is underinsured, would provide an incentive for insureds to underinsure. In any event, if the Legislature had found the policy concerns that the Minichs raise to be compelling, it could have written section 2051.5 to provide, "When a policy conditions payment of replacement cost on the replacement of a property, that condition is void whenever the fair market value of the property exceeds available coverage." Instead, section 2051.5 expressly acknowledges that a policy may condition the recovery of replacement costs on an insured replacing the dwelling.

---

[8] In their reply brief, the Minichs refer to a "Request for Judicial Notice" and to two exhibits taken from the legislative history of section 10102. However, the record does not contain either the request for judicial notice or the exhibits. Accordingly, we do not address the Minichs' request for judicial notice or the exhibits mentioned in the Minichs' reply brief. In any event, even assuming that the Minichs filed their request for judicial notice, there is nothing in the legislative history cited in the Minichs' reply brief that would have had any effect on our decision in this case.

■ We conclude that sections 2051 and 2051.5 do not require that Allstate pay monies provided for in the BSREL Endorsement without regard to whether the Minichs rebuilt their house. Accordingly, we conclude that the trial court properly granted judgment as a matter of law in favor of Allstate on the Minichs' claim for breach of contract.

### 2. The Minichs' claim for tortious breach of contract (bad faith) fails as a matter of law because Allstate did not breach the Policy

The Minichs claim that Allstate's failure to immediately pay them the monies provided for in the BSREL Endorsement constituted a breach of the implied covenant of good faith and fair dealing.[9] In light of our conclusion in part III.B.1., *ante*, that the trial court properly granted judgment as a matter of law in favor of Allstate on the Minichs' breach of contract claim, the Minichs' claim for tortious breach of contract also fails as a matter of law. (See *Everett v. State Farm General Ins. Co., supra*, 162 Cal.App.4th at p. 663 ["Because there was no breach of contract, there was no breach of the implied covenant."].)

We conclude that the trial court properly granted judgment as a matter of law in favor of Allstate on the Minichs' bad faith claim, and properly granted Allstate's motion for summary judgment.[10]

---

[9] One could interpret the Minichs' brief as raising the alternative argument that, even assuming that it was proper for Allstate to condition that payment on evidence that the Minichs were rebuilding their house, Allstate breached the Policy by delaying payment provided for in the BSREL Endorsement. In support of this argument, the Minichs contend, "The evidence provided by the Minichs clearly showed they were rebuilding." We reject any such argument. It is undisputed that Allstate paid the Minichs the *full* amount provided for in the BSREL Endorsement just one month after the Minichs' representative indicated that Allstate could inspect the *foundation* of the new house. In addition, it is undisputed that Allstate paid the Minichs *100 percent* of the amount provided for in the BSREL Endorsement more than three months before the Minichs' new house was even *50 percent* complete. The Minichs' opening brief fails to demonstrate how, in light of these undisputed facts, Allstate breached the Policy by delaying payment of the BSREL Endorsement. In their reply brief, the Minichs argue that Allstate breached the Policy by failing to reimburse them for repair expenses on an "incurred basis." However, their brief does not cite to evidence in the record in support of this contention. Accordingly, even assuming that the Policy required that Allstate reimburse the Minichs in such a fashion, the Minichs have failed to demonstrate that they are entitled to reversal on this ground.

[10] In light of our conclusion that the trial court properly granted Allstate's motion for summary judgment, we need not consider Allstate's alternative grounds for affirmance raised in its respondent's brief.

## IV.

## DISPOSITION

The judgment is affirmed. Allstate is entitled to recover its costs on appeal.

Huffman, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 8, 2011, S192488. Chin, J., did not participate therein.