Filed 9/25/24

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| SCOTT ENMARK et al., <br><br>    Plaintiffs and Respondents, <br><br>    v. <br><br> KC COMMUNITY CARE, LLC, et al., <br><br>    Defendants and Appellants. | B333022 <br><br> (Los Angeles County Super. Ct. No. 23STCV09657) |


APPEAL from an order of the Superior Court of Los Angeles County.  Michael L. Stern, Judge.  Affirmed.

Lewis Brisbois Bisgaard & Smith, Brittany B. Sutton, Rima M. Badawiya, Jennifer G. So and Suzanne Linda Schmidt for Defendants and Appellants.

Moran Law, Michael F. Moran, Lisa Trinh Flint and Suzan N. Tran for Plaintiffs and Respondents.

_____

The Lanterman-Petris-Short Act (LPS) (Welf. & Inst. Code, § 5000 et seq.) "authorizes the appointment of a conservator for up to one year for a person determined to be gravely disabled as a result of a mental disorder and unable or unwilling to accept voluntary treatment." (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1009.) Lisa Enmark (Lisa) was under an LPS conservatorship when she moved into Community Care Center, a skilled nursing facility (Facility). Her father Scott Enmark (Scott) signed two optional arbitration agreements with the Facility as Lisa's representative. After Lisa died, her parents (plaintiffs) sued the Facility's owners and operators (defendants), asserting both successor and individual claims. Defendants petitioned to compel arbitration. The trial court denied the petition, finding no evidence of Scott's authority to bind Lisa to arbitration on the successor claims. As for the wrongful death claim, the court found neither Scott nor Lisa's mother Marilyn Warhol (Marilyn) signed the agreements in their individual capacities.[1]

On appeal, defendants contend the successor claims are subject to arbitration because the LPS conservatorship order authorized Scott to sign the agreement on Lisa's behalf. Defendants also contend plaintiffs' wrongful death claim is subject to arbitration pursuant to *Ruiz v. Podolsky* (2010) 50 Cal.4th 838 and *Holland v. Silverscreen Healthcare, Inc.* (2024) 101 Cal.App.5th 1125.

## BACKGROUND

### I. Facts

#### A. LPS Conservatorship

In 2018, the superior court found Lisa was "gravely disabled" and "lack[ed] capacity to consent to psychotic medication." Scott was appointed as the LPS conservator of Lisa's person. The appointment was to expire in one year.

---

[1] Because Lisa and Scott have the same surname, we refer to them individually by their first name. For clarity and consistency, we also use the first name of Lisa's mother, Marilyn Warhol.

The LPS conservatorship order empowered Scott to place Lisa in "the least restrictive setting" for her "care and needs," including a medical or psychiatric nursing facility; to require Lisa to "have treatment related specifically to remedying or preventing the recurrence of" her "being gravely disabled"; and to require Lisa "to accept psychotropic medications."

The order also imposed "disabilities" on Lisa. She was prohibited from possessing a driver's license and a firearm or other deadly weapon, refusing or consenting to treatment for her mental health disorders and other medical conditions, and "enter[ing] into any contract in which the consideration for performance is money or property."

### B. Arbitration Agreements

In 2019, Lisa was admitted to the Facility. Upon her admission, Scott signed two separate arbitration agreements, identifying himself as Lisa's "Resident Representative." The first agreement subjected to binding arbitration "any dispute as to medical malpractice." The second agreement subjected to binding arbitration "any claim other than a claim for medical malpractice, arising out of the provision of services by the Facility." Signing the arbitration agreements was not "a precondition [of the resident's] admission," and the agreements could be "rescinded" in writing. Scott did not rescind the agreements. The agreements added they would bind not only the parties, but also the heirs, representatives, executors, administrators, successors and assigns of the parties, whose claims stem from a resident's admission to the Facility. The agreements each concluded with a certification: "By virtue of Resident's consent, instruction and/or durable power of attorney, I hereby certify that I am authorized to act as Resident's agent in executing and delivering of this arbitration agreement." Lisa did not sign the agreements.

3

## II. Proceedings

### A. Complaint

In 2021, Lisa was sexually assaulted in her room by a male resident at the Facility.[2] She died days later. Lisa was 37 years old.

Plaintiffs Scott and Marilyn filed a complaint against defendants KF Community Care, LLC, doing business as Community Care Center; Kirkside Facilities Operations, LLC; KSNF, LLC; Cambridge Healthcare Services, LLC; Jacob Wintner; and Ira Smedra.[3]

As Lisa's successor in interest, Scott asserted causes of action for dependent abuse, negligence, premises liability, negligent hiring, supervision, or retention, violation of the Patient's Bill of Rights (Health & Saf. Code, § 1430), and willful misconduct. Scott and Marilyn asserted a cause of action for wrongful death in their individual capacities.

### B. Petition To Compel Arbitration

Defendants petitioned to compel arbitration. The petition was supported by the declaration of Shannon Bland, executive director of KF Community Care, LLC. Attached to the Bland declaration were the arbitration agreements and the LPS conservatorship order. Also submitted was the declaration of Jorge Venturina, who signed the agreements as the Facility's representative. His job was to admit new residents. Venturina averred he had no recollection of admitting Lisa but recognized his signature on the agreements.

Appended to plaintiffs' opposition were the LPS conservatorship order and the arbitration agreement for disputes other than medical malpractice.

### C. Hearing and Ruling on the Petition

At a hearing on the petition, the trial court took the matter under submission following argument by counsel. The same day, the court

---

[2] These are allegations in the operative complaint; there has been no adjudication of the facts in this case.

[3] Barbara O'Conner, the facility's administrator, is also a named defendant. She is not a party to this appeal.

4

issued a minute order, denying the petition.  The court found defendants failed to establish Scott had authority to sign the agreements on Lisa's behalf to arbitrate the successor claims.  The court found Scott and Marilyn did not sign the agreements in their individual capacities to arbitrate the wrongful death claim.

Defendants timely appealed.

## DISCUSSION

### I. Applicable Law

#### A. LPS Act

"The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled.  ([Welf. & Inst. Code,] § 5150 et seq.)  The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled ([*id.*,] § 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement ([*id.*,] § 5350.1)." (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142.)  As defined by the LPS, a person is "gravely disabled" if "as a result of a mental health disorder, a severe substance use disorder, or a co-occurring mental health disorder and a severe substance use disorder, is unable to provide for their basic personal needs for food, clothing, shelter, personal safety, or necessary medical care."  (Welf. & Inst. Code, § 5008, subd. (h)(1)(A).)  An LPS conservatorship automatically terminates after one year, and the conservator may seek reappointment by filing a petition.[4]  (*Id.*, § 5361.)

" 'If a person is found gravely disabled and a conservatorship is established, the conservatee does not forfeit legal rights or suffer legal disabilities merely by virtue of the disability.  [Citations.]  The court must separately determine the duties and powers of the conservator, the disabilities imposed on the conservatee, and the level of placement appropriate for the conservatee.  ([Welf. & Inst. Code,] §§ 5357, 5358.)"

---

[4] Plaintiffs did not object to defendants' assertion in the trial court that Scott was annually reappointed as Lisa's conservator of her person until her death.

(*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165.) The imposed disabilities may include the rights to vote, to refuse or consent to treatment, or to enter into a contract, and the privileges of possessing a driver's license or a firearm. (*Ibid.*)

### B. Petition To Compel Arbitration

" ' "[T]he right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties." ' " (*Kinder v. Capistrano Beach Care Center, LLC* (2023) 91 Cal.App.5th 804, 811.) Basic principles of contract law govern that question. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.) The party seeking to compel arbitration bears the burden of proving the existence of an arbitration agreement between the parties, and the party opposing the motion bears the burden of establishing a defense to the agreement's enforcement. (*Ibid.*; *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)

Because arbitration is a matter of contract, the general rule is that one must be a party to an arbitration agreement to invoke or be bound by its terms. (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352; *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 706.) Notwithstanding this general rule, a person (and, more specifically, a resident in a skilled nursing care facility) who did not sign an arbitration agreement can be compelled to arbitrate if there is an agency relationship between the resident and the person who signed the agreement. (*Valentine v. Plum Healthcare Group, LLC* (2019) 37 Cal.App.5th 1076, 1085–1086.)

## II. Standard of Review

Defendants contend the trial court erred in denying their petition to compel plaintiffs' claims to arbitration. In evaluating the court's order, we review de novo any questions of law—such as the interpretation of a written instrument (*Logan v. Country Oaks Partners, LLC* (2022) 82 Cal.App.5th 365, 371)—as well as the application of that law to undisputed facts—such as the arbitrability of certain claims (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (*US*), *LLC, supra,* 55 Cal.4th at p. 236). We review for

6

substantial evidence any factual findings made by the trial court. (*Lopez v. Bartlett Care Center, LLC* (2019) 39 Cal.App.5th 311, 317–320.)

## III.     Scott's Successor Claims

Defendants first contend the trial court erred in finding they failed to prove Scott had authority to sign the agreements on Lisa's behalf to arbitrate the successor claims.

### A.     Agency Authority

An agent is someone who represents another—the principal—in dealings with third parties.  (Civ. Code, § 2295.)  "An agent has such authority as a principal actually or ostensibly confers upon him.  ([*Id.*,] § 2315.)  Actual authority is such as a principal intentionally confers upon an agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess.  ([*Id.*,] § 2316.)  Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess.  ([*Id.*,] § 2317.)  An agent will normally have the authority to do everything necessary or proper and usual in the ordinary course of business for effecting the purpose of his agency.  ([*Id.*,] § 2319.)  Authority may be granted to an agent either by a precedent authorization or a subsequent ratification.  ([*Id.*,] § 2307.)"  (*Ripani v. Liberty Loan Corp.* (1979) 95 Cal.App.3d 603, 611.)

### B.     Scott Was Not Lisa's Actual Agent

The crux of this case involves the construction of the LPS conservatorship order.  The issue is whether, as a matter of law, the order confers actual and/or ostensible authority on Scott to sign the arbitration agreements for Lisa.  If so, defendants have met their burden of proving valid arbitration agreements exist binding plaintiffs to arbitration of their successor claims.  (See *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC, supra,* 55 Cal.4th at p. 236.)

The LPS conservatorship order cannot be construed as establishing Scott's actual agency.  The hallmarks of actual agency are consent and control:  " ' "Agency is the relationship which results from

7

the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. 'The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.' " ' " (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571, quoting *Edwards v. Freeman* (1949) 34 Cal.2d 589, 592.) By its nature, the conservator-conservatee relationship is not derived from actual agency. It does not depend on whether the conservatee consents to the conservator's court-ordered authority. Nor is the conservator subject to the conservatee's control. Thus, with respect to actual agency, the LPS conservator agreement is not the basis for Scott's authority to act for Lisa in any capacity as a matter of law.

### C. Scott's Ostensible Agency Did Not Encompass Executing the Arbitration Agreements

Ostensible agency is a different matter. The LPS conservatorship agreement gave Scott ostensible or apparent authority to place Lisa in the Facility and to ensure she accepted and received all necessary medical care.[5] The question is whether Scott's authority as Lisa's conservator extended to signing the arbitration agreements on her behalf. In other words, to what extent can such authority be implied from the conservatorship order.

After the trial court denied defendants' petition to compel arbitration, but before the parties filed their briefs on appeal, the Supreme Court published its decision in *Harrod v. Country Oaks Partners, LLC* (2024) 15 Cal.5th 939 (*Harrod*). The parties address its application here.

*Harrod* concerned the enforceability of a separate and optional arbitration agreement between a skilled nursing facility and one of its residents. When the resident was admitted, a relative signed the

---

[5] Nothing in the record suggests the LPS conservatorship order was invalid or otherwise failed to properly authorize Scott to act as conservator of Lisa's person.

agreement but not the resident. The relative had power of attorney for the resident as provided by the Health Care Decisions Law (HCDL). (Prob. Code, § 4671, subd. (a).) This meant the relative was authorized to make "health care decisions" as the resident's agent should the resident later lack the capacity to make them.[6] (*Id.*, § 4629.) The issue in *Harrod* was whether the relative's execution of the arbitration agreement was a "health care decision" within the relative's authority. (*Harrod, supra,* 15 Cal.5th at p. 947.) If so, in signing the agreement the relative could bind the resident to arbitration of subsequent claims alleged against the nursing facility. (*Id.* at pp. 949–950.)

The Supreme Court first determined what is meant by a "health care decision," as it is not specifically defined in the HCDL. (*Harrod, supra,* 15 Cal.5th at pp. 951–958.) The *Harrod* court determined a "health care decision" "directly pertains to who provides health care and what may be done to a principal's body in health, sickness, or death." (*Id.* at p. 952.) A health care decision "excludes an optional, separate agreement that does not accomplish health care objectives." (*Id.* at p. 966.) The court explained, " 'Unlike admission decisions and medical care decisions, the decision whether to agree to an arbitration provision in a nursing home contract is not a necessary decision that must be made to preserve a person's well-being. Rather, an arbitration agreement pertains to the patient's legal rights, and results in a waiver of the right to a jury trial.' " (*Id.* at p. 959, quoting *Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 594.) Accordingly, the execution of an optional, separate arbitration agreement with a skilled nursing facility is not a "health care decision." (*Harrod*, at p. 966.)

The Supreme Court next considered whether the relative's power of attorney gave the relative implied power to execute the arbitration agreement on the resident's behalf. Here, the *Harrod* court acknowledged that Civil Code section 2319 "embodies the notion of implied authority—that an agent expressly granted a specific power

---

[6] " 'Health care' means any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect a patient's physical or mental health condition." (Prob. Code, § 4615.)

9

should have sufficient authority to effectuate it." (*Harrod, supra,* 15 Cal.5th at p. 960.) However, the reach of such implied authority is not unlimited. For a power of attorney is to be viewed as binding on the principal " 'it must appear that the act done by the agent was in the exercise of the power delegated, and within its limits.' [Citation.] "Put another way, an implied power ' "must be within the ultimate objective of the principal . . . ." ' " The *Harrod* court held under the law of agency, a power of attorney does not include the delegated authority to enter into separate optional arbitration agreements with health care providers. (*Id.* at pp. 961–963.)

Based on *Harrod* and our independent review, we conclude Scott's execution of the arbitration agreements was not a health care decision binding Lisa—and Scott's successor claims—to arbitration. Further, we conclude the court's reasoning concerning the scope of a power of attorney applies equally to Scott's ostensible authority under the conservatorship order. It did not authorize Scott to have Lisa's claims against the Facility arbitrated.

Defendants resist this conclusion. They chiefly rely on *Gordon v. Atria Management Co., LLC* (2021) 70 Cal.App.5th 1020 to argue the LPS conservatorship order gave Scott authority to execute the agreements. In *Gordon*, the appellate court held a relative's execution of an arbitration agreement on behalf of a skilled nursing facility resident was authorized by the relative's durable power of attorney. (*Gordon*, at p. 1027.) The *Gordon* court quoted language of the durable power of attorney that *expressly* empowered the relative to enter into contracts for the resident's care in a residential care facility, to arbitrate claims on the resident's behalf, and to perform any other act performed in conjunction with the power of attorney. (*Ibid.*)

According to defendants, the language of the LPS conservatorship order conferred similar authority on Scott: The order empowered him to contract for Lisa's placement, which necessarily encompassed his authority to make agreements connected to her placement. Additionally, the order prohibited Lisa from entering into contracts and left Scott's power to contract unrestricted. Defendants

10

posit this means Scott alone was authorized to sign the arbitration agreements.

To be sure, as *Harrod* acknowledged, an agent operating under a written instrument that "contain[s] a clear statement of the power to agree to arbitration or utilize[s] more general language encompassing that power" may bind the agent to arbitration. (*Harrod, supra,* 15 Cal.5th at p. 966.) That is not the case here.

Nothing in the LPS conservatorship order clearly authorizes Scott to agree to arbitration on Lisa's behalf, thereby empowering him to waive her right to a jury trial on any claims against the Facility. There is no express language to that effect. Nor is there a general or catchall provision from which that authority can be reasonably inferred. In asserting Scott derives such authority from his power to decide Lisa's placement, defendants overlook the fact that committing a conservatee to a facility for treatment is itself a health care decision. Probate Code section 4617, subdivision (a)(1) of the HCDL, defines "health care decision" as "a decision made by a patient or the patient's agent, conservator, or surrogate, regarding the patient's health care, including . . . [¶] . . . [s]election and discharge of health care providers and institutions." In sum, the trial court properly ruled Scott is not compelled to arbitrate his successor claims.

At oral argument, defendants urged us to focus on the word "placement" as it appears in the LPS conservatorship order, "In determining the placement of residence of the conservatee . . . ." Defendants maintained the word "placement" (in the Facility) implied Scott's authority to execute the arbitration agreements as part of the admission paperwork for acceptance as a resident. However, as required by state and federal law, the arbitration agreements were optional, separate from the admission contract, and had no bearing on Lisa's admission or treatment. (See Health & Saf. Code, § 1599.81, subds. (a) & (b).) As such, pursuant to *Harrod, supra*, 15 Cal.5th 939, the separate decision to agree to arbitration is unrelated and unnecessary to the health care decision of placing Lisa in the Facility for medical treatment. (*Id.* at p. 962 ["[C]hoosing a dispute resolution

11

method does not similarly serve the purpose of making 'health care decisions' when that choice is contained in a side agreement with no impact on health care or who administers it. The authority to make health care decisions—here, the authority to obtain skilled nursing care—could be 'fully performed' without reference to that side agreement."].) Thus, the word "placement" in the conservatorship order cannot be interpreted as implying Scott's authority to sign the arbitration agreements on Lisa's behalf.

## IV. Plaintiffs' Claim for Wrongful Death

Defendants also challenge the trial court's ruling that the arbitration agreements are not enforceable against plaintiffs' wrongful death claim. We are not persuaded.

In *Ruiz v. Podolsky, supra*, 50 Cal.4th 838 (*Ruiz*), the Supreme Court held all heirs in wrongful death actions are bound by arbitration agreements under Code of Civil Procedure section 1295, when the language of the agreement manifests an intent to bind the heirs. (*Id.* at p. 841; *Holland v. Silverscreen Healthcare, Inc., supra*, 101 Cal.App.5th 1125, 1132 (*Holland*) ["*Ruiz* concluded 'that section 1295, construed in light of its purpose, is designed to permit patients who sign arbitration agreements to bind their heirs in wrongful death actions' "].)

Defendants contend, as in *Ruiz* and *Holland,* plaintiffs are bound by the arbitration agreements. There are fatal flaws in defendants' argument. For starters, unlike Lisa, in *Ruiz* and *Holland* both the deceased residents of the nursing facilities signed the arbitration agreements binding their heirs. (*Ruiz, supra*, 50 Cal.4th 841; *Holland, supra*, 101 Cal.App.5th at p. 1128.) It is uncontroverted that Marilyn never signed the agreements. We know of no legal authority to support defendants' suggestion that Lisa's mother is bound by the agreements she did not sign. To be sure, Scott signed the agreements, but, as discussed, he lacked authority to bind Lisa and her heirs to arbitration. Nor did he sign the agreements in an individual capacity.[7]  Scott's

---

[7] Plaintiffs' wrongful death claim is personal to them; it lies independent of survivor claims. "Unlike some jurisdictions wherein wrongful death actions are derivative, Code of Civil Procedure section

12

wrongful death claim is thus not subject to arbitration. (*Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC* (2007) 150 Cal.App.4th 469, 474 [surviving spouse not required to arbitrate wrongful death claim because no evidence showed that he signed the arbitration agreement in his personal capacity].)

## V.    Remaining Arguments[8]

### A.    No Equitable Estoppel

Defendants' equitable estoppel argument rests on the notion that plaintiffs cannot assert that the LPS conservatorship order authorized Scott to admit Lisa to the Facility, yet did not authorize him to execute the arbitration agreements as part of the admission paperwork the same day. This argument seeks to create a false equivalency: The complaint's tort and statutory causes of action are not based on the existence of the admission agreement, and, even if they were, California law *mandates* the patient's agreement to arbitrate be completely separate from the admission agreement (Health & Saf. Code, § 1599.81, subd. (b)). More broadly, there is no inequity. The law places the risk on persons who deal with agents to " 'ascertain[] the scope of [the agent's] powers' " (*Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1134); thus, any unfairness in the arbitration agreement being unenforceable against plaintiff lies at defendants' own doorstep. This is no doubt why courts have rejected equitable estoppel arguments in the context presented in this case. (E.g., *id.* at pp. 1131–1132.)

---

377.60 'creates a *new cause of action* in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived.' " (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283.)

[8] Plaintiffs contend defendants have forfeited these arguments, among others. However, we may exercise out discretion to consider forfeited arguments (*Minish v. Allstate Ins. Co.* (2011) 193 Cal.App.4th 477, 489, fn. 6) and do so to address all challenges to the contested rulings.

## B. No FAA Violation

Defendants contend interpreting Scott's authority to sign the arbitration agreements more narrowly than his authority to sign the admissions agreement violates the Federal Arbitration Act (FAA).

The arbitration agreements in this case state they are governed by the (FAA). However, whether a valid arbitration agreement exists is determined by applying California law concerning the formation, revocation, and enforcement of contracts (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60), even if the challenged agreement would fall within the scope of the FAA. (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 357 ["the FAA does not apply until the existence of an enforceable arbitration agreement is established under state law principles involving formation, revocation and enforcement of contracts generally"].) The FAA does not bestow arbitration agreements with special status; it simply ensures arbitration agreements are as enforceable as other contracts. (*Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 384.) In the end, applying federal and California law lead to the same analysis because both bodies of law do not favor the arbitration of disputes unless agreed to by the parties. (*Logan v. Country Oaks Partners, LLC*, *supra*, 82 Cal.App.5th at p. 370.)

As stated, the dispute in this case centered on Scott's authority under the LPS to agree to arbitration on Lisa's behalf. The trial court was not asked to decide whether the admissions agreement was valid and enforceable. Indeed, that agreement is not part of the record. The court did not single out or bestow the arbitration agreements with special status, but rather considered whether they were enforceable in the same manner as other contracts. (See *Rogers v. Roseville SH, LLC* (2022) 75 Cal.App.5th 1065, 1077.)

14

**DISPOSITION**

The order denying the petition to compel arbitration is affirmed. Defendants KF Community Care, LLC et al. shall bear the costs on appeal.

CERTIFIED FOR PUBLICATION.


                                    LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.

15