Filed 9/12/13  Rideau v. Stewart Title of California CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EARL B. RIDEAU et al., | D061497 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2010-00096274-CU-BC-CTL) |
| STEWART TITLE OF CALIFORNIA, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jay Bloom, Judge.  Reversed; judgment directed.


Dennis R. Delahanty, a Prof. Corp. and Dennis R. Delahanty for Plaintiffs and Appellants.

Best Best & Krieger LLP, Robert J. Hanna, Kira L. Klatchko and Shannon M. Erickson for Defendant and Respondent.

## I.

## INTRODUCTION

Earl B. Rideau and Marina Rideau (the Rideaus) entered into an agreement with a developer, BGJB de Mexico, S. de R.L. de C.V. (BGJB), to purchase a condominium in a building to be constructed in Mexico. The Rideaus deposited $239,700 toward the purchase price with an escrow company, defendant Stewart Title of California (Stewart Title). The escrow instructions provide in relevant part:

> "ESCROW HOLDER is authorized and instructed to release funds as instructed by SELLER . . . without further authorization from BUYERS; said funds to be disbursed by California Fund Control to pay direct costs, commissions and construction costs only. California Fund Control and SELLER have in place, an agreement where California Fund Control inspects the project site and authorizes payment of construction costs to contractor, sub-contractors and suppliers according to a pre-approved voucher control system."

Stewart Title released the Rideaus' deposit, together with the deposits of other purchasers, to entities other than California Fund Control, including to BGJB. BGJB failed to construct the condominium building, and neither Stewart Title nor BGJB returned the Rideaus' deposit.

The Rideaus brought this action against Stewart Title. Among other claims, the Rideaus brought causes of action for breach of contract and negligence in which they alleged that Stewart Title had breached the escrow instructions by releasing their deposited funds to entities other than California Fund Control. The trial court held a bench trial, interpreted the escrow instructions, and concluded that, "[Stewart Title] had

2

no obligation to send funds to [California Fund Control]." The court entered a judgment in favor of Stewart Title on all of the Rideaus' claims.

On appeal, the Rideaus claim that the trial court misinterpreted the escrow instructions and erred in failing to find that Stewart Title breached the escrow instructions by releasing their funds to entities other than California Fund Control. With respect to their negligence claim, the Rideaus argue that Stewart Title breached its duty "to comply with the [Escrow Instructions]. . . ."

We conclude that the most reasonable interpretation of the escrow instructions is that they implicitly required Stewart Title to release the Rideaus' funds only to California Fund Control. In light of this interpretation, we conclude that Stewart Title breached the escrow instructions by releasing the Rideaus' funds to entities other than California Fund Control and that the Rideaus were entitled to judgment in their favor on their breach of contract claim. However, we conclude that the Rideaus cannot prevail on their tort claim for negligence based on Stewart Title's breach of contractual duties. We reverse the judgment and direct the trial court to enter a new judgment in favor of the Rideaus on their breach of contract claim and in favor of Stewart Title on the Rideaus' remaining causes of action.

FACTUAL AND PROCEDURAL BACKGROUND

A.     *The first amended complaint*

In March 2011, the Rideaus filed a first amended complaint against Stewart Title and GJL, S. de R.L. de C.V., a Mexican corporation (GJL).[1]  In the operative complaint, the Rideaus alleged that on or about May 2, 2007, they entered into a written agreement (Purchase Agreement) with BGJB, a Mexican corporation, for the purchase of a condominium in a building to be constructed, called "The Falls" (the Project).  The Project was to be built in the city of Playas de Rosarito, Mexico.

The Rideaus alleged that they entered into this agreement based upon the assurances of Shane Delmer, a salesperson for the Project.  According to the Rideaus, Delmer told them that their deposits for the purchase of the condominium would be held in an escrow account with Stewart Title, in the United States.  The Rideaus further alleged that "Stewart Title would distribute the funds to a fund control company [that] would periodically inspect the project and release the funds on an 'as work is done' basis utilizing a pre-approved voucher system . . . ."

The Rideaus claimed that a few days after entering in the Purchase Agreement, they delivered Sale Escrow Instructions (Escrow Instructions), together with an initial deposit of $5,000, to Stewart Title.  According to the Rideaus, they read and reviewed the Escrow Instructions and concluded that the instructions were consistent with Delmer's representations concerning the manner by which their deposits would be released.  The

---

[1]     GJL is not a party to this appeal.

Rideaus alleged that on or about June 13, 2007, they wired $234,700—the balance of their required deposit toward the purchase of the condominium, to Stewart Title.

The Rideaus further alleged that, "Although [BGJB] failed to enter into an agreement with California Fund Control, defendant Stewart Title failed to request and obtain further instructions from [the Rideaus] and [BGJB] as to the disposition of the deposited funds and instead released the deposited funds to [BGJB] or its principals." The Rideaus also claimed that BGJB failed to commence construction of the Project and that BGJB would be unable to commence construction in the foreseeable future due to a lack of funding.

In a negligence cause of action, the Rideaus alleged that Stewart Title negligently failed to: (1) determine whether BGJB had entered into an agreement with California Fund Control; (2) to inform the Rideaus regarding the lack of a fund control agreement; (3) to release the deposited funds only to California Fund Control; and (4) to request further instructions from BGJB and the Rideaus concerning the release of the deposited funds if release of the funds to California Fund Control was not possible. The Rideaus further alleged:

> "Plaintiffs were damaged in that they would not have deposited the funds into escrow or would have demanded the immediate return of the funds to them had they known no agreement for the disbursement of the funds by California Fund Control had been consummated; the deposited funds were not paid over by Stewart Title to California Fund Control or a similar company that would ensure that the deposited funds were used to pay 'direct costs, commissions and construction costs only' as provided for in the . . . Escrow Instructions; and the Condominium would [*sic*] not be constructed and thus the deposited funds will not be applied to the sale price of the Condominium."

5

The Rideaus alleged that Stewart Title had refused to return their deposits and that they had suffered damages in the amount of $239,700 as a result of Stewart Title's negligence.

In a breach of contract cause of action, the Rideaus incorporated by reference their previous allegations and contended that Stewart Title had failed to perform its obligations as set forth in the Escrow Instructions. The Rideaus alleged that Stewart Title's breach of the Escrow Instructions had damaged them in the amount of $239,700—the amount of their deposits.[2]

B.     *The court trial*

After the parties waived their right to a jury trial, the trial court held a bench trial on the Rideaus' first amended complaint.

1.     *The Rideaus' evidence*

Section IV of the Escrow Instructions provides:

> "**RELEASE OF FUNDS**:  From BUYERS['] deposit in escrow, ESCROW HOLDER is authorized and instructed to release funds as instructed by SELLER, upon receipt of this signed instruction from all principals and clearance of BUYERS['] funds, without further authorization from BUYERS; said funds to be disbursed by California Fund Control to pay direct costs, commissions and construction costs only.  California Fund Control and SELLER have in place, an agreement where California Fund Control inspects the project site and authorizes payment of construction costs to

---

[2]     Although not at issue in this appeal, the Rideaus also brought causes of action for fraud (third cause of action) and breach of fiduciary duty (fourth cause of action) against Stewart Title, and a third party beneficiary breach of contract claim against Stewart Title and GJL (fifth cause of action) based on an alleged agreement between GJL and Stewart Title (the GJL Agreement).  The Rideaus alleged that in the GJL Agreement, "Stewart Title agreed to pay . . . 50% of the [Rideaus'] deposited funds to GJL, and GJL agreed to pay [the Rideaus] the total amount of the deposited funds . . . ."

6

contractor, sub-contractors and suppliers according to a pre-approved voucher control system. The undersigned BUYERS and SELLER hereby acknowledge that they are aware that Stewart Title, its officers and employees make no warranty or representation of any kind or nature, either express or implied, as to the ownership or condition of title to the property described in this escrow, nor as to the conditions of this escrow will have been complied with nor will any document be filed for recording in connection therewith. **We, the undersigned, hereby hold Stewart Title harmless from any loss or damage which may be sustained by reason of the above disbursement instruction, and for the failure of any of the conditions of this escrow, and for the recovery of said money so released, and agree to defend you against any claims whatsoever arising from [*sic*] and [*sic*] any attorneys fee, expenses or costs incident thereto**." (Emphasis in original.)

The Rideaus presented evidence that they deposited $239,700 with Stewart Title pursuant to the Escrow Instructions, that Stewart Title distributed the Rideaus' funds to entities other than California Fund Control, and that Stewart Title had not returned the Rideaus' deposits.

Earl Rideau also testified concerning his interpretation of the Escrow Instructions, as follows:

> "[I]t was my understanding that the seller . . . according to the [E]scrow [I]nstructions would instruct the escrow company to release funds. And then those funds were to be released to California Fund Control. California Fund Control was the only one mentioned in the escrow instructions who actually disburses funds. There's no mention . . . of the funds being disbursed by the escrow company to the seller or else the fund control is a moot point. [¶] You're not going to get the developer to give the money back to the fund control so that they could in turn give the money back to the developer. That's irrational. That's illogical. So I took it at face value."

7

The Rideaus also offered in evidence Delmer's affidavit.[3] Delmer testified in relevant part:

> "During 2007, I was employed as an onsite salesperson for [the Project]. . . . [¶] Typically, during the sales process with a buyer I would explain how purchases would be conducted. . . . I would specifically point out that the transaction would require that funds be placed into escrow with Stewart Title Company. I would then explain that there would be a voucher system through California Fund Control to pay for the construction of the project and related costs of the project. I would explain these procedures to make the potential buyers feel more comfortable in purchasing real estate in a foreign country."

The Rideaus offered in evidence the Purchase Agreement between the Rideaus and BGJB, which provides in relevant part:

> "All deposits shall be made payable to Stewart Title. The deposits shall be withheld and released by Stewart Title in accordance with the terms of the Escrow Contract.
>
> "Also, the parties agree that the release of the payment of the PRICE by Stewart Title shall be made in accordance with the Construction Supervision and Resource Management Contract entered into by (in process) and [BGJB], through which said company will instruct Stewart Title to release the PRICE that the BUYERS progressively pays under this Contract and the progress of the construction of the Unit."

The Rideaus also presented the expert testimony of Judy Lydick, an escrow officer and consultant to escrow companies. Lydick offered her opinion concerning what the Escrow Instructions required of an escrow officer in order for the officer to comply with the standard of care in the escrow industry. Lydick testified in part:

---

[3] The trial court admitted Delmar's affidavit without objection pursuant to an agreement between the parties.

8

"The escrow instructions are created in a format that an escrow officer really has to choose which portion of those escrow instructions they're going to abide by. [¶] If I were to receive this . . . instruction, the first thing I would do, [is] cease . . . sending out the money until it was clear as to whether the money is to be released to anyone the seller delegated for the money to go to or whether the money's going to the California Fund Control."

Lydick also stated that, in her opinion, the Escrow Instructions were "misleading" if the parties intended to permit Stewart Title to release the deposited funds to BGJB.

The Rideaus also presented the expert testimony of Jeff Katzer, a real estate broker and former chief executive officer of a bank that specialized in construction lending, who testified concerning the use of voucher and fund control systems in the construction finance industry. Katzer testified in relevant part as follows:

"One of the primary components to a construction loan which is tantamount [*sic*] to the success of the completion of the project is that [the] lender enters into a fund control . . . within their own bank, if they have the facilities to have that system in place, or [they] will contract with [a] third party independent fund control company. That company then will evaluate from the cost breakdown and create stages of disbursements. Those stages of disbursements will be funded under a voucher system or completion of those stages by elements of, say, foundation, grading, electrical, things of that nature.

"Once those agreements are in place and the voucher system is in place, the lender then will, upon request of the developer for specific funds to meet a specific line item, those funds will then be released to the fund control. Fund control will inspect the property. Determine that they've met the line item component, where the money went to that contractor or subcontractor [*sic*] or material provider. And, in fact, lien releases were in place. Without that happening, the moneys can go sideways. Developers can get ahead of the project. [The] project may not be finished on time or sufficient funds remaining in the loan account to complete the project."

9

2.    *The defense*

Stewart Title presented the expert testimony of Donna Grosso, an escrow officer and manager of an escrow company. Grosso testified concerning whether Stewart Title had met the standard of care for performing escrow services. Grosso stated that she interpreted the Escrow Instructions as permitting Stewart Title to release the buyers' funds upon the seller's instruction, without further limitation. Grosso further testified that language pertaining to California Fund Control in the Escrow Instructions was "a thing between the buyer and the seller."

C.    *The trial court's statement of decision*

The trial court issued a statement of decision in which it found for Stewart Title on all of the Rideaus' causes of action. With respect to the Rideaus' breach of contract cause of action, the trial court noted that the Rideaus claimed that Stewart Title had breached the Escrow Instructions in numerous ways, including "failing to release the [Rideaus] funds to California Fund Control." With respect to the Rideaus' contention that Stewart Title was required to release their funds only to California Fund Control, the trial court stated:

> "[I]t is claimed the funds should have been released to [California
> Fund Control]. However, without any mechanism for such funding,
> it is unclear to the court how this should have been done. In
> addition, as noted above,[4] the [Escrow Instructions] did not require

---

4    The trial court apparently was referring to a portion of its statement of decision in which it stated the following:

> "[The Rideaus'] argument assumes [Stewart Title] was to release the
> funds upon instruction by the seller and then disburse the funds to
> [California Fund Control] under the [Escrow Instructions]. . . .The

10

[Stewart Title] to release funds to [California Fund Control].  It said the funds were to be disbursed by California Fund Control."

With respect to the Rideaus' breach of contract claim, the trial court stated the following:

"Also, if the [Escrow Instructions are] read with consideration of the language as well as the custom and practice in the industry as indicated by the defense expert, there is no breach of the [Escrow Instructions].  The first part of Section IV [of the Escrow Instructions] indicates the escrow holder is authorized and instructed to release funds as instructed by seller upon receipt of the signed [Escrow Instructions] from all principals and clearance of buyers' funds without further authorization from the buyers.  This clause clearly required the escrow company to release the funds upon order of the seller without any instruction from the buyer.  The next clause indicating said funds are to be disbursed by [California Fund Control] does not relate to the escrow company.  It states the funds are to be distributed by California Fund Control[.]

"According to the uncontradicted testimony of the defense expert, this clause deals with the obligations between the buyer, seller, and creditors.  It has nothing to do with the escrow company."

In addition to finding in favor of Stewart Title on the Rideaus' breach of contract cause of action, the trial court found in favor of Stewart Title on the Rideaus' causes of action for negligence, breach of fiduciary duty, and fraud.  The court also found that the Rideaus were not entitled to prevail on their breach of contract claim premised on the GJL Agreement.

---

[Escrow Instructions] state[] that the funds are to be disbursed by [California Fund Control].  It does not state [Stewart Title] was to send the funds to California Fund Control.  Thus, [Stewart Title] had no obligation to send funds to [California Fund Control]."

11

D.     *The judgment and the appeal*

A few weeks after issuing its statement of decision, the trial court entered judgment in favor of Stewart Title.  The Rideaus timely appealed from the judgment.

III.

DISCUSSION

A.     *Stewart Title breached the Escrow Instructions by releasing the Rideaus' funds to entities other than California Fund Control*

The Rideaus claim that the trial court erred in failing to find that Stewart Title breached the Escrow Instructions by releasing their funds to entities other than California Fund Control.  Resolution of the Rideaus' claim requires that we interpret the Escrow Instructions.

1.     *Standard of review*

We must first determine the appropriate standard of review to apply in interpreting the Escrow Instructions.  In *People v. Paredes* (2008) 160 Cal.App.4th 496, 507, this court discussed the applicable law governing this determination:

> " '[T]he "interpretation of a contract is subject to de novo review
> where the interpretation does not turn on the credibility of extrinsic
> evidence." '  [Citations.]  'In contrast, "[i]f the parol evidence is in
> conflict, requiring the resolution of credibility issues, we would be
> guided by the substantial evidence test.  [Citation.]"  [Citation.]' "
> (*Id*. at p. 507.)

In this case, both parties contend that this court should apply the de novo standard of review on appeal.[5] We agree that, as Stewart Title states in its brief, the trial court's "conclusions, as expressed in the Statement of Decision, were based on the plain language of the [Escrow] Instructions," and that the de novo standard of review therefore applies on appeal.

We acknowledge that the trial court stated that the testimony of Grosso, concerning the "custom and practice in the industry," supported the court's interpretation of the Escrow Instructions. However, our review of the record reveals that Grosso's testimony was not based on extrinsic evidence of the custom and practice in the escrow industry that might be "admissible to interpret the written words" of the Escrow Instructions. (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 20.) Rather, Grosso's opinion was based on her own interpretation of the Escrow Instructions. Grosso stated that her opinion was based on her "read[ing] . . . of the escrow instructions," and a review of her testimony makes clear that such testimony was based on an examination of the language of the Escrow Instructions. (See e.g., "[w]e had a paragraph here that say's we're authorized and instructed to release funds as instructed by seller"; "[i]t says 'From buyers' deposit in escrow, escrow holder is authorized and instructed to release funds as instructed by the seller"; "if the seller instructed us to

---

5       The Rideaus argue, "The interpretation of the . . . Escrow Instructions presents a question of law for the appellate court to determine anew." Stewart Title argues, "[I]nterpretation of a contract is reviewed independently on appeal . . . . .The [Escrow] Instructions here . . . are clear on their face, and it was not necessary for the trial court to admit, or rely on, nor did the trial court admit or rely on, extrinsic or parole evidence to interpret them."

disburse to California Fund Control, we would do so.  But all the instructions state here [is] it comes from the seller"; "[y]ou have a semicolon after 'buyers' which starts a new thought process.")

Even assuming that Grosso's testimony was admissible for the purpose of interpreting the Escrow Instructions (but see *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1180 ["[e]xpert opinion on the legal interpretation of contracts has . . . been found to be inadmissible"]), it is clear that a proper interpretation of the Escrow Instructions does not turn on the credibility of Grosso's testimony.  Thus, we conclude that the parties are correct that the de novo standard of review applies.  (See *People v. Paredes*, *supra*, 160 Cal.App.4th at p. 507.)

      2.     *Governing law*

      a.     *The duties of an escrow holder*

In *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705 (*Summit*), the Supreme Court described the duties of an escrow holder as follows:

> " 'An escrow involves the deposit of documents and/or money with a third party to be delivered on the occurrence of some condition.' [Citations.]  An escrow holder is an agent and fiduciary of the parties to the escrow.  [Citations.]  The agency created by the escrow is limited—limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow.  [Citations.]  If the escrow holder fails to carry out an instruction it has contracted to perform, the injured party has a cause of action for breach of contract.  [Citation.]"  (*Id*. at p. 711.)

"An escrow holder has an implied obligation to do all of the things normally done by an escrow agent which were not expressly excluded by the escrow instructions.

14

[Citation.] Upon the escrow holder's breach of an instruction that it has contracted to perform or of an implied promise arising out of the agreement with either party, the injured party acquires a cause of action for breach of contract. ([Citation]; *Claussen v. First American Title Guaranty Co.* (1986) 186 Cal.App.3d 429, 435 [(*Claussen*)].) As noted in *Claussen*, *supra*, at page 436, '. . . some escrow instructions may be implicit in the express instructions given. (*Gordon v. D & G Escrow Corp.* (1975) 48 Cal.App.3d 616, 621-623 [(*Gordon*)]—escrow instructions implicitly required proceeds of sale to be paid to both sellers.) In the event of a conflict or apparent error in instructions, the escrow holder is obliged to take corrective steps before obeying questionable instructions. [Citations.]' " (*Kirk Corp. v. First American Title Co.* (1990) 220 Cal.App.3d 785, 807.)

        b.     *Principles of contract interpretation*

"Escrow instructions are interpreted under the rules applicable to contracts." (*Claussen*, *supra*, 186 Cal.App.3d at p. 437.)

The general principles of contract interpretation are well established:

> " ' "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' . . ." [Citation.]' [Citation.]" (*Minich v. Allstate Ins. Co.* (2011) 193 Cal.App.4th 477, 485.)

15

In addition, and of particular relevance to this case, is the following statutory rule of contract interpretation:

> "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  (Civ. Code, § 1641.)

This principle is embodied in case law in numerous formulations, all of which guide our interpretation of the Escrow Instructions.  (See e.g., *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 18 ["We must view the language of a contract as a whole, avoiding a piecemeal, strict construction approach"]; *Sprinkles v. Associated Indem. Corp.* (2010) 188 Cal.App.4th 69, 82 [" '[t]he character of a contract is not to be determined by isolating any single clause or group of clauses' "]; *In re Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 799 ["[E]ven if one provision of a contract is clear and explicit, it does not follow that that portion alone must govern its interpretation; the whole of the contract must be taken together so as to give effect to every part"]; *Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, 1063 (*Advanced Network*) [" 'We must give significance to every word of a contract, when possible . . .' "]; *Hayden v. Robertson Stephens, Inc.* (2007) 150 Cal.App.4th 360, 367 [" 'A construction rendering some words surplusage is to be avoided' "].)

3.  *The Escrow Instructions implicitly required Stewart Title to release the Rideaus' funds only to California Fund Control*

a.  *The Escrow Instructions*

The Escrow Instructions provide in relevant part:

> "**RELEASE OF FUNDS**:  From BUYERS['] deposit in escrow, ESCROW HOLDER is authorized and instructed to release funds as

16

instructed by SELLER, upon receipt of this signed instruction from all principals and clearance of BUYERS['] funds without further authorization from BUYERS; said funds to be disbursed by California Fund Control to pay direct costs, commissions and construction costs only. California Fund Control and SELLER have in place, an agreement where California Fund Control inspects the project site and authorizes payment of construction costs to contractor, sub-contractors and suppliers according to a pre-approved voucher control system."

b.	*The most reasonable interpretation of the Escrow Instructions is that they implicitly require that, upon instruction from seller, the escrow holder release the buyers' funds to California Fund Control for disbursement by California Fund Control*

The signed Escrow Instructions clearly and unambiguously permitted Stewart Title to release the Rideaus' funds upon an instruction from BGJB and clearance of the Rideaus' funds. Further, reading the instruction as a whole, as we must (Civ. Code, § 1641), the Escrow Instructions implicitly authorized Stewart Title to release the Rideaus' funds to only one entity—California Fund Control.

To begin with, in the same sentence in which the Escrow Instructions authorize Stewart Title to release the Rideaus' funds, the instructions state that "said funds" would be disbursed by California Fund Control. California Fund Control could not *disburse* "said funds" without having *received* those funds. Further, the disbursement clause of the sentence pertaining to California Fund Control is separated from the remainder of the sentence pertaining to Stewart Title's release of the funds by only a semicolon. A semicolon is used to separate parts of a sentence that "are too closely connected to be made into separate sentences." (Bryan A. Garner, A Dictionary of Modern Legal Usage (2d Ed. 1995) p. 717.) By using a semicolon and the phrase "said funds," the text and

17

grammar of the Escrow Instructions indicate that Stewart Title was authorized, upon BGJB's instruction, to release the Rideaus' funds *to California Fund Control*.

The structure of the Escrow Instructions supports this interpretation. The references to California Fund Control appear in Section IV of the Escrow Instructions, entitled "RELEASE OF FUNDS"—the portion of the instructions that expressly imposes duties on Stewart Title. Further, Stewart Title's contention that it was authorized to "release funds as instructed by BGJB" without any limitation, would render the bulk of this section surplusage because if Stewart Title were authorized to release the funds to *any* entity merely upon BGJB's instruction, there would be no reason to include *any* of the language in the Release of Funds section pertaining to California Fund Control.

An interpretation rendering such a large portion of the Release of Funds section of the Escrow Instructions surplusage should be avoided. (See *National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279 ["An interpretation which renders part of the instrument to be surplusage should be avoided"].) Rather, we should interpret that portion of the Escrow Instructions authorizing Stewart Title to "release funds as instructed by SELLER," in light of the remainder of the sentence, which provides, "said funds to be disbursed by California Fund Control. . . ." (See *In re Quantification Settlement Agreement Cases*, *supra*, 201 Cal.App.4th at p. 799.)

Further, "In determining the meaning of a written instrument, we are permitted to consider not only its language, but also ' "the circumstances under which [it] was made and the matter to which it relates." ' " (See *PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 152.) Our interpretation of the Escrow

18

Instructions fully comports with the purpose for which the principals to an escrow agreement would use a fund control agent. A fund control agent is used to ensure that funds intended for the construction of real property are actually and properly used by the owner-builder to construct that property. (See e.g., *Summit*, *supra*, 27 Cal.4th at p. 713 ["a lender agreed to fund an owner-builder's construction of homes, and to ensure that the loan funds would actually be used to pay the construction costs, the lender deposited the funds with the plaintiff fund control agent"].)

The Escrow Instructions expressly provided that the fund control agent (California Fund Control) would "inspect[] the project site and authorize[] payment of construction costs to contractor, sub-contractors and suppliers according to a pre-approved voucher control system." In order for a fund control agent to perform this function, it is essential that the fund control agent *receive* the funds that it is to disburse for the payment of construction costs. The Rideaus' interpretation of the Escrow Instructions is fully consistent with this purpose: upon instruction from BGJB, the escrow holder was authorized and instructed to release the Rideaus' funds to California Fund Control for disbursement by California Fund Control to pay direct costs, commissions and construction costs.

In contrast, Stewart Title's interpretation of the Escrow Instructions to the effect that, upon BGJB's instruction, it was authorized to release the funds to *any* entity that BGJB selected—including BGJB itself—is completely inconsistent with the purpose of having a *funds control agent* disburse the funds. We can think of no reason, and neither the trial court nor Stewart Title has offered any, as to why principals to an escrow

19

agreement who intended to use a fund control agent to disburse funds for a construction project, would intend to permit the escrow holder to release funds *directly* to entities *other* than the fund control agent. As noted above, the entire raison d'être of a fund control agent is to act as an intermediary between those funding a construction project and those building the project. To put it simply, *a fund control agent* cannot disburse a project's funds if the *builder* directs the disbursal of the funds instead.

Stewart Title's contention that references in the Escrow Instructions pertaining to California Fund Control implicates only *BGJB's* duty to the Rideaus not only fails to make practical sense, it is also in conflict with the fact that this language appears in the *Escrow* Instructions, which describe and control *Stewart Title*'s release of the funds deposited into escrow.[6]

---

[6] Although not material to our decision in light of the applicable de novo standard of review, we disagree with the trial court's statement that, "According to the *uncontradicted testimony* of the defense expert, th[e] clause [pertaining to California fund Control in the Escrow Instructions] deals with the obligations between the buyer, seller and creditors." (Italics added.)

The Rideaus' expert testified on this subject as follows:

"If . . . the intent, was to release the money to the seller, then I would eliminate all verbiage regarding the California Fund Control because that is misleading. If the money was to be paid to the seller or someone the seller wanted, all that wording about California Fund Control would be out . . . and the [Escrow Instructions] would read that the moneys were to be paid to the seller or someone delegated by the seller. And then all the information about California Fund Control shouldn't be there. It's misleading. It gives [the Rideaus] a false feeling of security."

Contrary to Stewart Title's contention, its interpretation finds no support in the Purchase Agreement. As noted previously, the Purchase Agreement provides in relevant part:

> "[T]he parties agree that the release of the payment of the PRICE by Stewart Title shall be made in accordance with the Construction Supervision and Resource Management Contract entered into by (in process) and [BGJB], through which said company will instruct Stewart Title to release the PRICE that the BUYERS progressively pays under this Contract and the progress of the construction of the Unit."

We reject Stewart Title's suggestion that this provision "unequivocally stated that BGJB would instruct Stewart Title to release funds." To begin with, the reference to "said company" in the provision is ambiguous, and may reasonably be read to refer to the company with which BGJB would enter into a Construction Supervision and Resource Management Contract, rather than to BGJB itself. In any event, even if "said company" is interpreted as referring to BGJB, the provision is fully consistent with our interpretation of the Escrow Instructions that Stewart Title was authorized, upon BGJB's instruction, to release the Rideaus' funds *to California Fund Control*. Moreover, the provision expressly states that "the release of the payment of the PRICE by Stewart Title shall be made *in accordance with* the Construction Supervision and Resource Management Contract." (Italics added.) It is undisputed that BGJB never entered into a Construction Supervision and Resource Management Contract (i.e. a fund control agreement). It is thus clear that Stewart Title did *not* release the Rideaus' deposits "in accordance with" a fund control agreement. This provision of the Purchase Agreement

21

therefore does not support Stewart Title's contention that it complied with the Escrow Instructions.

3.    *Stewart Title breached the Escrow Instructions*

It is undisputed that Stewart Title released the Rideaus' funds in the amount of $239,700 to entities other than California Fund Control.[7]  In light of our interpretation of the Escrow Instructions provided above, the release of the Rideaus' funds to entities other than California Fund Control constituted a breach of the instructions.

Accordingly, we conclude that the trial court erred, as a matter of law, in entering judgment in favor of Stewart Title on the Rideaus' breach of contract cause of action.

B.    *The judgment may not be affirmed on the basis of the exculpatory provisions in the Escrow Instructions*

Stewart Title contends that the judgment may be affirmed based on the following provisions in the Escrow Instructions:

> "The undersigned BUYERS and SELLER hereby acknowledge that they are aware that Stewart Title, its officers and employees make no warranty or representation of any kind or nature, either express or implied, as to the ownership or condition of title to the property described in this escrow, nor as to the conditions of this escrow will have been complied with nor will any document be filed for recording in connection therewith. **We, the undersigned, hereby hold Stewart Title harmless from any loss or damage which may be sustained by reason of the above disbursement instruction,**

_____

[7]    For example, during his opening statement at trial, Stewart Title's counsel stated:

> "There were disbursements. We will show money was disbursed pursuant to the seller's instructions, and that those funds went to the contractor.  Everyone, I think, assumed they would go to California Fund Control.  They did not. And the developer later said that they were incapable of obtaining the loan, and unfortunately, they had used the money."

22

**and for the failure of any of the conditions of this escrow, and for the recovery of said money so released, and agree to defend you against any claims whatsoever arising from [*sic*] and [*sic*] any attorneys fee, expenses or costs incident thereto.**" (Emphasis in original.)

Stewart Title argues that it contended in the trial court that these provisions "stated that Stewart Title would be held harmless from any losses caused by distributing funds *in accord with the [Escrow] Instructions*." (Italics added.) Similarly, on appeal, Stewart Title contends that "the Rideaus agreed that Stewart Title would not be held liable for any 'loss or damage' for disbursing monies *in accord with the [Escrow] Instructions*." (Italics added.) Stewart Title also contends, "The hold-harmless clause did not absolve Stewart Title from wrongdoing or negligence. Instead, the clause protected Stewart Title for *complying with the [Escrow] Instructions. . . .*" (Italics added.)

We concluded in parts III.A.2 and III.A.3, that Stewart Title *breached* the Escrow Instructions in the manner by which it released the Rideaus' funds. In light of Stewart Title's acknowledgement that the exculpatory provisions in the Escrow Instructions do not "absolve Stewart Title from wrongdoing," and apply, if at all, only in the event that Stewart "*compl[ied]* with the [Escrow] Instructions," and released funds "*in accord with the [Escrow] Instructions*" (italics added), the judgment may not be affirmed on the basis of these provisions.[8]

---

[8] In its statement of decision, the trial court expressed its view that the exculpatory provisions in the Escrow Instructions likely could not be enforced to insulate Stewart Title from liability:

"[Stewart Title] also alleges that it is not liable because of the hold harmless clause in the escrow instructions. Although the court does

23

C.	*The Rideaus are not entitled to reversal of the judgment on their negligence cause of action*

The Rideaus claim that the trial court erred in ruling in Stewart Title's favor on their negligence cause of action.  In support of this contention, the Rideaus argue that Stewart Title breached its duty "to comply with the [Escrow Instructions] . . . ."  This argument fails because a plaintiff may not prevail on a tort cause of action for negligence based on the defendant's breach of contractual duties, in the absence of an independent violation of tort law.  (*Money Store Investment Corp. v. Southern California Bank* (2002) 98 Cal.App.4th 722, 731 (*Money Store*).)  As the *Money Store* court explained:

> "In essence, the Money Store alleges the [escrow holder] breached a duty to it by failing to perform as specified in the Money Store's instructions.

---

> not have to reach this issue here, it does not appear the hold harmless clause would insulate [Stewart Title] from liability.  See *Diaz v. United California Bank* (1977) 71 Cal.App.3d 161, 171 [(*Diaz*)]; *Akin v. Business Title Corp.* (1968) 264 Cal.App.2d 153, 157 [(*Akin*)]."

> In *Akin*, the court applied *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 (*Tunkl*), and concluded, on public policy grounds, that "that the exculpatory clause before us cannot relieve the escrow company from liability." (*Akin, supra*, 264 Cal.App.2d at p. 159; see also *Diaz, supra* 71 Cal.App.3d at p. 171 [citing *Akin* and *Tunkl* and stating, "Where the public interest is affected the exculpatory clause will be held invalid"].)

> We need not determine whether the exculpatory provisions in this case could validly be enforced to exculpate Stewart Title for liability for breaching the Escrow Instructions, since Stewart Title does not contend that the provisions should be interpreted in such a fashion.

24

" 'The Supreme Court has rejected the transmutation of contract actions into tort actions "in favor of a general rule precluding tort recovery for noninsurance contract breach, at least in the absence of violation of 'an independent duty arising from principles of tort law' [citation] other than the bad faith denial of the existence of, or liability under, the breached contract."  [Citation.]' [Citation.]  As alleged, the Money Store's cause of action for negligence would be subject to summary adjudication because it does not state a negligence cause of action apart from its contract cause of action." (*Id*. at pp. 731-732.)

In a separate one-sentence section of their brief, the Rideaus also contend that they are entitled to reversal of judgment on their negligence cause of action because Stewart Title "fail[ed] to disclose its on-going relationship with [BGJB], the fact that [BGJB]] was its client, that it met with [BGJB] on several occasions, yet never once spoke to the Rideaus."  The Rideaus fail to present any legal argument or authority in support of this contention.  Accordingly, we deem the contention forfeited.  (See, e.g., *People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879 [" 'An appellate brief "should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as [forfeited], and pass it without consideration.' [Citation.]"  [Citation.]' "].)

25

IV.

DISPOSITION

The judgment is reversed and the matter is remanded to the trial court. On remand, the trial court shall enter a new judgment in favor of the Rideaus on their breach of contract cause of action and in favor of Stewart Title on the remaining causes of action in the first amended complaint, in a manner consistent with this opinion. The trial court may also conduct any further ancillary proceedings that it deems necessary in order to enter the judgment. The Rideaus are entitled to costs on appeal.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.